## Richmond

UNITED MASONRY, INCORPORATED V. JEFFERSON
MEWS, INC., ET AL

September 1, 1977.

Record No. 760724.

Present: All the Justices.

*Victor F. Rinaldi (Lewis, Wilson, Cowles, Lewis and Jones, Ltd.,* on briefs), for appellant.

*Raymond J. Diaz (Walutes and Diaz,* on brief), for appellees.

COMPTON, J., delivered the opinion of the court.

In this appeal from the dismissal of a bill of complaint in a creditors' rights suit, we determine the validity of a blanket mechanic's lien filed against a condominium project.

Before we deal with the specific facts of this case, we will set the stage with a brief discussion of the historical background and nature of the now-popular method of real estate ownership — the "Condominium."

While the concept was almost unknown in this country before 1960, there is evidence of its recognition elsewhere for centuries. It was used by the ancient Hebrews in the fifth century B.C., in ancient Babylon during the second century B.C., and by the French during the Middle Ages.[1] In modern times, the use of the

---

[1] A. Ferrer & K. Stecher, Law of Condominium § 31 (1967); Kerr, *Condominium — Statutory Implementation,* 38 St. John's L. Rev. 1, 3 (1963).

system in Europe was accelerated by the housing shortages and rent controls which followed the First and Second World Wars.[2] From Europe condominium spread to Latin America, then to Puerto Rico in 1958 and to the United States in 1961.

In 1962, with the enactment of the Horizontal Property Act [hereinafter HPA], Acts 1962, ch. 627, Virginia became one of the first states to adopt legislation to permit the condominium form of property ownership.[3]

In general, the term "condominium" means "a system of separate ownership of individual units in multi-unit projects." [4] The unit owner acquires, together with his interest in a specific unit, an interest as "a tenant in common in the underlying fee and in the spaces and building parts used in common by all the unit owners." [5] A condominium devoted to residential purposes has been characterized as:

> "a multi-unit dwelling each of whose residents enjoys exclusive ownership of his individual apartment. With 'title' to an apartment goes a cotenant's undivided interest in the common facilities — the land, the hallways, the heating plant, etc. Remarkably flexible, condominium is susceptible of an endless variety of legal formulations and can be adapted to a multiplicity of land uses or project designs. But in all of its forms its principal goal remains constant: to enable occupants of a multi-unit project to achieve more concomitants of ownership than are ... available either to renters or to [owners of cooperative apartments]. The realization of this goal depends mainly on whether the individual units will gain independent dignity as mortgage security and as a basis for property taxation." [6]

Virginia's HPA defined "condominium" as "the ownership of a single unit in a multiple unit structure with common elements in a condominium project." Acts 1962, ch. 627 § 2; Code § 55-79.2(c) (1974 Repl. Vol.).

---

[2] Kerr, *supra.*

[3] Report of the Committee to Study and Recommend Revision of the Condominium Laws to The Governor and The General Assembly of Virginia, House Doc. No. 5, 1 (1973) [hereinafter cited as Report].

[4] 1 P. Rohan & M. Reskin, Condominium Law and Practice 1-1 (rev. ed. 1977) [hereinafter cited as Rohan].

[5] *Id.* n.1.

[6] Berger, *Condominium: Shelter on a Statutory Foundation,* 63 Colum. L. Rev. 987, 989 (1962) [hereinafter cited as Berger].

The concept has also been described as "horizontal ownership of space", a unique type of landholding which exists primarily under the authority of special statutes.[7] The idea sought to be conveyed by use of the word "horizontal" in referring to horizontal property legislation or condominium legislation is that:

"a single column of vertical space may be segmented in ownership into horizontal strata. Thus, in a high-rise condominium project, owner *A* may be the fee owner of the horizontal space consisting of the first floor, owner *B* the fee owner of the horizontal space consisting of the second floor, etc. . . . [But] the central idea of the 'condominium' is not separate ownership of layers of vertical space. It is, rather the *combination* of separate ownership of space with shared ownership of various 'common elements' in a project. A condominium project may, for example, consist of attached single-family dwelling houses if the separate owners share, as tenants in common, ownership of such elements as the land, roof, plumbing facilities, etc." [8]

With this review of the history and nature of condominium as a background, we now examine Virginia's current legislation on the subject as it pertains to the issue we shall presently address.[9]

During its 1974 session, the General Assembly enacted the "Condominium Act" [hereinafter The Act]. Acts 1974, ch. 416; Code §§ 55-79.39 to -.103 (1977 Cum. Supp.). It superseded the HPA but did not affect the validity of any provision of any condominium instrument recorded prior to July 1, 1974. Code § 55-79.40. The need for this wholesale revision of the existing statutes arose because the HPA, which was based on a Puerto Rican model, was felt to "unreasonably restrict the inherent flexibility of the condominium concept, while failing to provide an adequate measure of purchaser protection in this new field of real estate law." [10] Commentators have hailed the enactment as

[7] 6 Thompson on Real Property 8 2981 at 14 (1962 repl. vol. Supp. 1976).

[8] Bergin, *Virginia's Horizontal Property Act: An Introductory Analysis,* 52 Va. L. Rev. 961, 961 n.1 (1966) [hereinafter cited as Bergin].

[9] For an overall analysis of The Act, see *Property 1973-1974* Virginia Survey, 60 Va. L. Rev. 1583, 1591-99 (1974) [hereinafter cited as *Property Survey*].

[10] Report, *supra* note 3, at 3-4.

being "a dramatically new condominium statute",[11] and have predicted it will "serve as model legislation for the nation." [12]

Provisions in The Act for adjustment of terminology facilitate the transition from the 1962 HPA to the 1974 Act. For example, the former terms "horizontal property regime" and "condominium project" are deemed by The Act to correspond to the term "condominium"; "apartment" now corresponds to "unit"; "co-owner" now coincides with "unit owner"; "council of co-owners" with "unit owners' association"; "developer" with "declarant"; "general common elements" with "common elements"; and, "master deed" now corresponds with the term "declaration" and is included in the term "condominium instruments." Code § 55-79.40.

The Act, in Code § 55-79.41, subparagraphs (a), (d), (e), (f), (o2), (y) and (z), respectively, provides the following definitions which will become significant during consideration of the case *sub judice:*

" *'Common elements'* shall mean all portions of the condominium other than the units."

" *'Condominium'* shall mean real property, and any incidents thereto or interests therein, lawfully submitted to this chapter by the recordation of condominium instruments pursuant to the provisions of this chapter. No project shall be deemed a condominium within the meaning of this chapter unless the undivided interests in the common elements are vested in the unit owners."

" *'Condominium instruments'* shall be a collective term referring to the declaration, bylaws, and plats and plans, recorded pursuant to the provisions of this chapter. Any exhibit, schedule, or certification accompanying a condominium instrument and recorded simultaneously therewith shall be deemed an integral part of that condominium instrument. Any amendment or certification of any condominium instrument shall, from the time of recordation of such amendment or certification, be deemed an integral part of the affected condominium instrument, so long as such amendment or certification was made in accordance with the provisions of this chapter."

---

[11] Rohan, *supra* note 4, Jun. 1977 Cur. Devel. Supp. 74.
[12] *Property Survey, supra* note 9, at 1591.

" *'Condominium unit'* shall mean a unit together with the undivided interest in the common elements appertaining to that unit. . . ."

" *'Land'* is a three-dimensional concept and includes parcels with upper or lower boundaries, or both upper and lower boundaries, as well as parcels extending ab solo usque ad coelum. Parcels of airspace constitute land within the meaning of this chapter. Any requirement in this chapter of a legally sufficient description shall be deemed to include a requirement that the upper or lower boundaries, if any, of the parcel in question be identified with reference to established datum."

" *'Unit'* shall mean a portion of the condominium designed and intended for individual ownership and use. . . ."

" *'Unit owner'* shall mean one or more persons who own a condominium unit, . . ."

We now turn to the material proceedings, facts and issues of this case. The appeal stems from a decree of the trial court which sustained a demurrer to an intervening petition (bill of complaint) to enforce a mechanic's lien on Jefferson Mews, a condominium project located in the town of Herndon, Fairfax County.

Plaintiff-appellant United Masonry, Incorporated, in the business of masonry construction and subcontracting, filed the intervening bill in May of 1975. The already-pending original bill to enforce mechanic's lien, which had been filed in December of 1974 by a corporation engaged in the business of landscaping and supplying nursery stock, named as defendants various proprietary interests in the condominium project. Among the defendants were appellees Jefferson Mews, Inc. (the developer); Council of Co-owners of Jefferson Mews Condominium, Joseph A. Stover and Raymond J. Diaz, Trustees, Myron P. Erkiletian, and Emil M. Keen, all representing unit owners and various lien-holders at Jefferson Mews; and The Hanover Insurance Company, surety on the bond filed pursuant to statute for the release of mechanic's liens on the property (hereinafter collectively referred to as defendants).

To the intervening petition, the defendants filed a demurrer on the grounds that the mechanic's lien asserted by United Masonry had "not been apportioned among the various

condominium units" and the "description of the property liened is not adequate to effectively describe the property on which the lien is asserted." The trial court sustained the demurrer for the reason that "the Memorandum of Mechanic's Lien filed . . . by United Masonry, Inc., claiming a lien upon Jefferson Mews, a condominium, fails to apportion the total amount claimed under two separate contracts, one for the construction of condominium buildings, and the other for the construction of certain condominium common elements, among the various individual condominium units." We granted United Masonry an appeal from the trial court's February 7, 1976 order dismissing the intervening bill.

The facts of this case must necessarily be gleaned from the allegations of the intervening bill. Viewing these allegations as we must on demurrer, we accept as true all material facts which are properly pleaded in order to decide the basic issue of whether plaintiff United Masonry has stated a cause of action against the defendants.

In the intervening bill, plaintiff alleged that defendant Jefferson Mews, Inc. "is a Virginia corporation engaged in the development of [the] condominium apartment project" in question; that United Masonry "contracted for the improvement of certain real property" owned by Jefferson Mews, Inc.; that in January of 1973, plaintiff and Jefferson Mews, Inc. "entered a contract in writing for [$350,000 to perform] the masonry work on 132 garden apartments"; and that, subsequently, the plaintiff and Jefferson Mews, Inc. "entered an oral contract for [$18,336 for] the masonry work on a club house pursuant to terms set forth in an unsigned proposal dated May 16, 1974" and accepted by the president of the corporation. Copies of the 1973 contract and the 1974 proposal were attached to the plaintiff's pleading.

Plaintiff further alleged that "pursuant to the aforesaid contracts" it performed work and furnished materials having a value of $44,932 for which it had not been paid. The exhibits attached to the bill show $34,846 due under the 1973 written contract and $10,086 due under the 1974 oral contract.

The plaintiff also alleged that it caused to be recorded in a timely manner a Memorandum of Mechanic's Lien among the land records of Fairfax County "claiming its lien against property more particularly described therein." Attached to the intervening bill was a machine copy of the mechanic's lien

memorandum addressed to Jefferson Mews, Inc. and the owners of 25 units in Jefferson Mews. The memorandum and affidavit followed the form suggested by Code § 43-5 and reads, in part:

"1. Type of materials or services furnished:
"Masonry labor and materials.
"2. Amount of claim: $44,932.00
"3. Type of structure on which work done or materials provided:
"Condominium apartment project and bath house.
"4. Brief description and location of real property:

"JEFFERSON MEWS as the same appears more particularly described in a Master Deed of Jefferson Mews dated May 21, 1973, and recorded July 20, 1973, in Deed Book 3878 at page 301 and amended by instrument recorded in Deed Book 3972 at page 643 among the land records of Fairfax County, Virginia."

The Master Deed referred to in the foregoing description is a part of the record on appeal. Attached to the 17-page deed as exhibits are a site plan, a building location plan, a 13-page document entitled "By-Laws of Jefferson Mews Plan of Condominium Apartment Ownership", and a six-page "Property Maintenance Agreement" between the Council of Co-owners of Jefferson Mews and Jefferson Mews, Inc.

Jefferson Mews, as described in the Master Deed, is a 264-unit condominium project established under the provisions of the HPA. The deed fixed these 264 units within eight groups of buildings on approximately 12.5 acres. Each building consisted of three floors. The buildings contained the following types of apartments: one-bedroom, one-bedroom with den, two-bedroom and three-bedroom. The site plan shows a swimming pool and bathhouse located near the center of the project.

Typical of the Master Deed description of the apartments, or units, is the following delineation of the boundaries of the one-bedroom apartments which includes the horizontal boundaries for that type of apartment on each of the three floors:

"(a) The one-bedroom Apartments are 1048 square feet in

size. Their horizontal and vertical boundaries are defined as follows:

 (i) Horizontal Boundaries:

  A. Terrace floor one-bedroom Apartments:
The plane of the center line of the floor slab separating the terrace floor one-bedroom Apartment from the Apartment above and the underside of the lowest floor slab.

  B. First floor one-bedroom Apartments:
The plane of the center line of the floor slab separating the first floor one-bedroom Apartment from the Apartment above and the plane of the center line of the floor slab separating the first floor one-bedroom Apartment from the Apartment below.

  C. Second floor one-bedroom Apartments:
The plane of the center line of the floor slab separating the second floor one-bedroom Apartment from the Apartment below and the plane of the ceiling joint cord of the roof truss.

 (ii) Vertical Boundaries: The plane of the outer surface of the exterior walls which do not separate an Apartment from other Apartments and the plane of the center line of the walls which separate the Apartment from other Apartments and shall include windows, window frames, doors, door frames and trim included in such exterior walls and, when there is attached to the Apartment a balcony, terrace, patio, canopy, steps, stairway or other structure serving only such Apartment, then such Apartment shall also include such structures and fixtures thereon. Whenever the context so requires, the word 'Apartment' shall be deemed to include the interest of the owner thereof in the General Common Elements hereafter defined. The main door of each one-bedroom Apartment has access to a corridor or stairway as shown on Exhibit A."

The Master Deed specifies the common elements to be:

 "2. General Common Elements: The General Common Elements of the Project are as follows:

  A. The parcel of land described in Paragraph FIRST of this Deed.

  B. Corridors, stairways, sidewalks, driveways, roadways and roads, common paved areas, common planting areas and

recreational areas, underground sanitary and storm sewers and systems, and appurtenances thereof, underground gas, water, electric, telephone and television lines, pipes, conduits, wires and appurtenances, underground drainage systems and catch basins, site lighting, masonry meter enclosures, roofs, roof drainage pipes, gutters and leaders, yard hydrant water systems, and appurtenances, and any profits or proceeds therefrom distributable by the Council of Co-Owners.

    C. Swimming pool and bathhouse."

Paragraph FIRST of the deed provides:

"FIRST: That Grantor [developer] owns in fee simple the following property situate in the Town of Herndon, County of Fairfax, Commonwealth of Virginia, which is described on SCHEDULE A [which defines the boundaries of the 12.5-acre tract], annexed hereto and incorporated herein . . . and which, together with the improvements erected and to be erected thereon, and the rights, privileges and appurtenances to the same belonging, is sometimes herein collectively referred to as the 'Property.' "

The Master Deed also establishes the title and interest of each unit owner in the common elements as a percentage according to apartment type. This interest "is based on an approximate proportion of the square footage of each Apartment to the total square footage of all Apartments in Jefferson Mews." The deed provides that the proportionate share of the common expenses of each co-owner shall be based on the same percentage as is established for his interest in the common elements. The deed further provides for the administration of the condominium and specifies such shall be in accordance with the Master Deed and bylaws and subject to the provisions of the property maintenance agreement executed by the Council of Co-owners.[13] The Master Deed requires each unit owner to comply with its provisions, the provisions of the bylaws, decisions and resolutions of the Council of Co-owners, and the provisions of the property maintenance agreement.

[13]The HPA defined "Council of co-owners" as "all the [owners of apartments within the buildings] acting as a group in accordance with the bylaws of the horizontal property regime". Code § 55-79.2(f) (1974 Repl. Vol.)

The bylaws of the Council of Co-owners provide that the Council will have "ultimate responsibility of administering" the project, approving the annual budget and establishing monthly assessments to be paid by the unit owners to meet all project common expenses including premiums for insurance and water and sewer bills for the units. Additional provisions contained in the bylaws govern voting in the Council; establishment of a board of directors; selection of Council officers; obligations of the unit owners relating to maintenance and repair, and to use of the apartments and common elements; rules of conduct; and notice to the Council in the event a co-owner gives a deed of trust on his apartment.

In the Property Maintenance Agreement with the developer, the Council acknowledges its responsibility for administering the condominium, states its desire to aid members and prospective purchasers in obtaining financing for the purchase of units in the project, and recognizes that the value of individual units will be dependent upon proper maintenance and upkeep of the project. The Council, therefore, agrees to establish and collect monthly assessments from the co-owners and to establish reserve funds for the purpose of repairing paved areas, repairing roofs on the units and painting the exterior of the apartments as the need arises. In addition, provision is made for establishment of a "general operating reserve account" to furnish "a measure of financial stability during periods of special stress" and to meet "deficiencies from time to time as a result of delinquent assessments from co-owners." The agreement also permits, with approval of the developer, self-management by the Council or employment of a management agent.

Continuing now with the allegations of the intervening bill, plaintiff asserted that the developer had "conveyed condominium units to purchasers and said purchasers [had] executed Deeds of Trust upon their respective units", and that the several deeds and deeds of trust conveyed the unit described therein and

"'the undivided interest in the General Common Elements and all other rights and privileges which attach to said Apartment, as described in that certain Master Deed,' . . . ."

At the bar of this court, the parties stipulated that when the memorandum of lien was recorded, only 132 units had been constructed and that construction of the remaining 132 units had not begun. The bill alleges that of the 132 completed units, 25 had been conveyed by the developer to individual purchasers.

The plaintiff's bill concluded with the prayer that the validity and amount of its lien be ascertained; that it be granted judgment against the surety and Jefferson Mews, Inc.; [14] and that if plaintiff's lien be adjudged invalid, it be granted personal judgment against the developer.

As we have said, the legal sufficiency of the plaintiff's pleading is the basic issue generated by the demurrer and the general question is whether the trial court erred in declaring the mechanic's lien invalid. We are dealing here with two different components of masonry work — the work performed on 132 individual apartment units, on the one hand, and the work performed on the bathhouse, one of the common elements, on the other. So, more precisely, the issue is whether the blanket mechanic's lien is invalid for failure to apportion the value of the work performed between the individual condominium units and the common element facilities.

At the core of the plaintiff's argument is the contention that only one contract was involved, that is, the 1973 written agreement. United contends the work done on the bathhouse in accordance with its May 1974 proposal was merely "extra work" performed under the 1973 contract. The plaintiff points out that no estimates of cost were a part of the single contract, no unit prices were set forth, and no models were constructed. In sum, plaintiff contends, apportionment was impossible because there was no basis on which to ascertain the cost of the work done on any particular condominium unit. Furthermore, it is argued, the "very nature" of condominium "requires the recognition of blanket mechanic's liens" covering the entire project "without apportionment as to the individual units or specific common elements," because in condominium the common elements are indivisibly associated with each unit. Plaintiff points to the Master Deed which provides:

[14] The original bill of complaint, to which plaintiff's bill was an intervening petition, sought judgment against the developer *and* the owners of individual units, jointly and severally.

"That the undivided interest in the General Common Elements shall not be separated from the Apartment to which it appertains and shall be deemed conveyed or encumbered with the Apartment even though such interest is not expressly mentioned or described in the conveyance or other instrument."

The Act contains a similar provision. Code § 55-79.55(f).

Plaintiff relies on *Sergeant* v. *Denby*, 87 Va. 206, 12 S.E. 402 (1890), in which a joint or blanket lien on two houses and two lots was held to be valid. The claim arose from a single contract between an owner and contractor for construction of the two dwellings on separate lots situated on opposite sides of a street in the City of Norfolk. The contract was for a lump sum for the entire work on both houses, with no provision that a separate account for each house should be kept. The defense in the suit to enforce the lien of a materialman was that the lien must be separate and distinct on each building for the amount of materials actually delivered for its construction. This court rejected that argument and stated:

"It is clear, therefore, that, as between the general contractors and the owner, the two buildings must be considered as, in effect, one piece of work, and that the right of the former to a joint lien on both for any balance due them, upon complying with the terms of the statute, could not have been successfully controverted. Indeed, in such a case, the lien must be joint or not at all; for although a lien is a creature of the statute, it must have its foundation in a contract. Hence it must correspond with the contract, as has been decided by other courts in analogous cases upon statutes similar to ours."

87 Va. at 208, 12 S.E. at 402.

The plaintiff also relies on the following language from *Gilman* v. *Ryan*, 95 Va. 494, 28 S.E. 875 (1898), a case in which a joint lien was declared void for failure to file, as required by the statute then existing, a detailed statement of account:

"If the contract under which the materials are furnished and the work done upon two buildings, erected upon disconnected lots, makes no estimate of the price of the materials furnished and the work done upon each, but provides generally for furnishing material and doing work

upon both, it may be, as was held in *Sergeant & wife* v. *Denby*, . . . that the whole sum is a lien upon both buildings, but this cannot be so where an estimate is made or the price fixed for the materials furnished and work done upon each, without disregarding both the letter and the spirit of the mechanic's lien law, . . . ."

95 Va. at 498, 28 S.E. at 876.

To further support its position, plaintiff cites *In re Thomas A. Cary, Inc.*, 412 F. Supp. 667 (E.D. Va. 1976), *aff'd per curiam*, No. 76-1879 (4th Cir. Jun. 21, 1977) (unpublished opinion), in which one blanket mechanic's lien was filed by a supplier of ready-mixed cement and a supplier of building materials against an entire 50-lot subdivision. The issue arose in a bankruptcy proceeding and the evidence showed the products were supplied, on open account, in bulk and not to a specific lot or building. One of the suppliers, however, had prepared models and estimates which were used to calculate the amount of materials which would be needed. The parties contesting the validity of the lien, a lender and the title insurer, argued that *Sergeant's* endorsement of blanket liens in Virginia was limited to cases involving contractors, subcontractors and owners, and was inapposite in suits between non-contracting third parties. The district court disagreed and, in sustaining the validity of the lien, said:

"The essence of the mechanic's liens laws is to protect materialmen when they have provided supplies and have not been compensated. In enacting the mechanic's liens statute, the Commonwealth of Virginia has enunciated its policy consideration that materialmen and suppliers should be paid or have the recourse of lodging a lien against the property. The Court does not believe that this policy should be vitiated when a subdivision and joint liens are involved. The nature of the development of a subdivision provides impediments to the use of a single lien."

412 F. Supp. at 674.

The defendants argue that the memorandum of lien fails to substantially comply with the provisions of Code §§ 43-3 and 43-4 [15] because it does not apportion between the properties the value of the work performed and, therefore, creates no lien.

---

[15]"§ 43-3. **Lien for work done and materials furnished.** — All persons performing labor or furnishing materials . . . for the construction, . . . of any building or

Acknowledging the rule of *Sergeant* v. *Denby*, they state that if an owner and contractor include "in one contract the work on the several properties as a single piece of work, with no separate estimate or price for the work on each structure, then a single memorandum on the several properties without a statement of the amount of work and labor provided to the properties may be permissible." But, defendants argue, "[i]f, on the other hand, the work was based on separate contracts, or based on a single contract with separate prices or estimates for the work to be done on the several properties, then the memorandum must show the prices fixed or the estimate made for the work and labor contributed to each of the properties, else both the letter and the spirit of the mechanic's lien law is violated." Defendants contend that the work in this case was done under two separate contracts and, therefore, the plaintiff's memorandum must show the prices fixed for the material and work contributed to each of the several properties, particularly when, as here, the interests of third parties are involved.

Defendants argue that under certain circumstances a blanket, or joint, mechanic's lien may be valid on a condominium project. They say that if in this case work had been done under a single contract which added value to only 132 units and a memorandum had been recorded which claimed a joint lien on only those 132 units, the lien would have been valid. But here, the defendants argue, the plaintiff has done work under both the apartment contract, which benefited only 132 units, and under the contract for the bathhouse, one of the common elements, which added value to 264 properties; yet the lien is sought for the entire amount of the work against the whole project without

structure permanently annexed to the freehold, . . . shall have a lien, if perfected as hereinafter provided, upon such building or structure, and so much land therewith as shall be necessary for the convenient use and enjoyment thereof, . . . ."

"§ 43-4. Perfection of lien by general contractor; recordation and notice. — A general contractor, in order to perfect the lien given by § 43-3, shall file at any time after the work is done and the material furnished by him and before the expiration of ninety days from the time such building, . . . is completed, or the work thereon otherwise terminated, in the clerk's office in the county or city in which the building, . . . or any part thereof is, . . . a memorandum showing the names of the owner of the property sought to be charged, and of the claimant of the lien, the amount and consideration of his claim, and the time or times when the same is or will be due and payable, verified by the oath of the claimant, or his agent, including a statement declaring his intention to claim the benefit of the lien, and giving a brief description of the property on which he claims a lien. . . ."

See also Code § 43-15.

apportioning the amounts that are due on the several properties liened against.

Defendants principally rely on *Weaver* v. *Harland Corporation*, 176 Va. 224, 10 S.E.2d 547 (1940). In that case, several mechanic's lienors had released as many as 12 lots from the operation of a blanket lien previously filed upon 20 lots in a subdivision. The lienors sought to enforce their joint liens in the amount of the total balances due for the materials furnished for the entire group of 20 lots against as few as eight lots. This court held that the releases of portions of the houses and lots rendered void the liens against the other properties for the balances alleged to be due. There it was said:

> "We are aware of the fact that the authorities are not agreed as to this, but, we think, the weight of authority and the force of reason sustain the view that the release of a portion of the properties, under the circumstances of this case, embraced by the lien, precludes its successful assertion against the remainder. This is only true where the interests of other lien creditors are affected. It would not be so in the case of the owner and the lienor. It will be readily seen that if it were not so the mechanics lien lienors could so shift their liens as to unduly burden some of the lien subjects and relieve others, to the extent of imperiling the interests of other lien creditors which would not be consonant with the intent and spirit of the statute and would be offensive to good conscience and equity."

176 Va. at 227-28, 10 S.E.2d at 548. The court went on to demonstrate the "overburdening" effect of such a release procedure by stating that one of the lienors had a contract for $7,000 on the 20 lots, or an average of $350 per house, whereas that lienor was then claiming a balance of $4,655 due against the unreleased eight lots, or an average of about $580 per lot.

In this case, we think the trial court was correct in holding that United Masonry's lien is invalid and we affirm.

The starting point of an analysis of the legal issue presented must be with the facts established by the pleadings, specifically the plaintiff's bill and exhibits. Contrary to plaintiff's one-contract argument, the bill flatly and clearly alleges that there were two separate contracts, the 1973 "contract in writing" for the 132 units and the 1974 "oral contract" for the "club

house" (bathhouse). This conclusion of fact drawn from the bill itself is supported by two attached exhibits individually incorporated by reference in the bill, which demonstrate the plaintiff treated the contracts separately and did not consider the latter an extension of the former. The exhibits are two different October 1974 "verified statements" of account on plaintiff's billhead, both captioned "Requisition", addressed to Jefferson Mews, Inc. One shows $34,846 due under a "Basic Contract" for $350,000, obviously the 132-unit agreement. The other shows $10,086 due under another "Basic Contract" for "bathhouse" in the amount of $18,336.

The second important conclusion of fact made from the pleadings, and this is not disputed by plaintiff, is that the plaintiff sought to incumber the entire property in one lien for all of the work done and materials furnished.

But what comprised "the property" of the condominium project on December 3, 1974, the day the memorandum of lien was recorded? Defendant contends that on July 20, 1973, the day the Master Deed was recorded, the entire condominium came into existence. They argue that 264 units were created, and that those units existed on that day and thereafter "just as surely as any other piece of real estate in Virginia exists." Defendants argue that, on the day the lien was recorded, 132 units had been completed and 132 units were yet to be constructed, but 264 units were in existence in contemplation of the HPA and The Act. In response, plaintiff labels "patently ludicrous" and "preposterous" defendants' theory that property in the form of cubicles of airspace was created before the structure which surrounds the space had been built. Plaintiff contends that it is only claiming a blanket lien on the 132 units which had actually been constructed and not on 132 nonexistent units.

But the plaintiff fails to recognize that under the HPA, and subsequently The Act, when the Master Deed was recorded, for the purposes of the condominium statutes, 264 units and their associated common elements were thereby constituted, not physically, but as integral parts of an established property regime. The basis of the condominium concept is the theory that as a parcel of real estate may be subdivided into contiguous lots, likewise area above the land may be subdivided into a number of three-dimensional air spaces, each susceptible of being

separately conveyed and incumbered.[16] The common law rule that the owner of land held title to all below it to the center of the earth and all above it to the limits of the sky has been modified so that now the landowner is generally held to own only that amount of airspace he can reasonably use.[17] Therefore, as provided under the HPA and The Act, the developer may subdivide the airspace above the land and convey the subdivided portions in fee.[18] This is not a new concept. The original common law permitted a deed of a room or a suite of rooms to be made separately from the soil beneath. One commentator has pointed out that Lord Coke wrote:

"'A man may have an inheritance in an upper chamber, though the lower buildings and soile be in another, and seeing it is an inheritance corporeall it shall passe by livery.'"[19]

The Act explicitly recognizes this concept, as we have already noted. Within the definition of "Land", The Act provides that "[p]arcels of airspace constitute land within the meaning of this chapter." Code § 55-79.41(o2). This severance from the soil "of an estate in the subdivided cubes in the sky"[20] is analogous to the accepted rule that minerals below the topsoil may be severed from the surface lot.[21]

It is true, of course, that the individual apartments in Jefferson Mews did not come into physical being until they were actually built. But with the recording of the Master Deed, the regime had been established; rights and liabilities had become fixed. For example, the individual owners of the units which are built have, according to the Deed, an individual liability for common expenses based on the proportion which the square

---

[16]Pohoryles, *The FHA Condominium: A Basic Comparison With the FHA Cooperative,* 31 Geo. Wash. L. Rev. 1014, 1018 (1962-63) [hereinafter cited as Pohoryles].

[17]*Id.; United States* v. *Causby,* 328 U.S. 256 (1946).

[18]Pohoryles, *supra* note 16, at 1018-19. *See generally* 1A Thompson on Real Property § 242 (1964 repl. vol.) 2 H. Tiffany, The Law of Real Property § 483.57 at 255 (3d ed. 1977 Cum. Supp.); Comment, *Home Ownership in Space — Pie in the Sky?,* 14 Hastings L. J. 263 (1962-63).

[19]Ball, *Division Into Horizontal Strata of The Landspace Above The Surface,* 39 Yale L. J. 616, 621 (1930) [hereinafter cited as Ball]. *Accord,* Bergin, *supra* note 9, at 963 n.7.

[20]Pohoryles, *supra* note 16, at 1019.

[21]*Id. See* Ball, *supra* note 19, at 633; *Virginia Coal & Iron Co.* v. *Kelly,* 93 Va. 332, 336, 24 S.E. 1020, 1022 (1896).

footage of each unit bears to the *"total* square footage of *all* Apartments *in Jefferson Mews"* (emphasis added), that is, 264 planned units and not just those actually built. So while certainly, as the plaintiff urges, a blanket mechanic's lien here cannot be enforced against 132 unbuilt apartments, such joint lien on the whole project does attach to the land on which these 132 planned units will stand and such a lien directly affects the whole project, as we shall demonstrate against the background of settled principles of law.

■ Code § 43-3, *supra* note 15, authorizes a lien upon a building or structure, and so much land therewith as shall be necessary for the convenient use and enjoyment of the premises, for the labor performed and materials furnished in the construction of any such building or structure. This is because the object of the law is to give those who, by their labor and material, have enhanced the value of the building the security of a lien thereon to the extent they have added to its value, but not to give a lien therefor upon property not benefited by such labor and materials. *Gilman* v. *Ryan, supra,* 95 Va. at 498, 28 S.E. at 876. Such policy of the law becomes particularly important when, as here, the interests of third parties (*e.g.,* acquisition lenders, construction lenders, other mechanic's lienors, subsequent purchasers, and deed of trust holders from subsequent purchasers) may be impinged upon by a joint lien. See *Weaver* v. *Harland Corporation, supra.*

■ In this case, the first contract was for work on only 132 units, with a balance claimed due of approximately $34,000, while the second contract was upon the common elements of the entire 264-unit project, with a balance due of about $10,000. But the memorandum of lien claims an unapportioned $44,000 upon all the units. As defendants argue, it is manifest that the 132 units which were not begun at the time the memorandum was filed received no benefit from the first contract, yet a lien based largely upon the first contract is sought upon them. Thus, the memorandum does not seek to secure the claim to the extent that plaintiff has added value to the individual units worked on, but attempts to lien other property not benefited by such work. Consequently, the memorandum fails to substantially comply with Code § 43-3, and does not fall within the rule of *Sergeant* v. *Denby, supra.*

The plaintiff also relies on *Plateau Supply Company* v. *Bison Meadows Corporation*, 31 Colo. App. 205, 500 P.2d 162 (1972). That case is inapposite. There, a blanket lien on a condominium was approved. But a Colorado statute, unlike any Virginia statute, allowed filing of a blanket lien and also permitted the lienor to *arbitrarily* apportion the value of the work done between the various improvements and enforce his lien as so apportioned. The decision in *Cary, supra,* likewise does not aid plaintiff's cause. The court in *Cary* treated the case as a *Sergeant* v. *Denby* situation in upholding a blanket lien on a subdivision. But, as we have already said, that rule does not apply here.

The plaintiff points, however, to the release provisions of The Act contained in Code § 55-79.46(b) and contends that any improper "overburdening" of individual units is eliminated by the statute. We do not agree.

That section provides that if any mechanic's lien becomes effective against two or more condominium units subsequent to the creation of the condominium, any unit owner may remove his unit from that lien by payment of the amount attributable to his unit. Such amount is to be computed by reference to the liability for common expenses appertaining to that unit pursuant to Code § 55-79.83(c), which provides that the amount of all common expenses not specially assessed, less the amount of all common profits, shall be assessed against the individual units in proportion to the number of votes in the unit owners' association appertaining to each such unit. Code § 55-79.77 provides that each unit must be allocated an equal number of votes in the association or the unit must be assigned a number of votes proportionate to the undivided interest in the common elements appertaining to each such unit. The Master Deed in this case contains the latter provision.

Therefore, as defendants contend, in this 264-unit condominium we can assume that the owners of the 132 completed units have votes approximately equal to one-half of the total undivided interests in the project. So, under § 55-79.46(b), if each of the 132 owners of the completed units pays his share of the claim to obtain a release of his unit from the lien, one-half of the $44,000 claim will be satisfied. The remaining $22,000 would continue as a lien on the 132 unstarted units; of that amount at least $12,000 ($34,000 due on the first

contract less $22,000 payments made) would be for labor and materials never provided to the second 132 units. Moreover, the remaining balance of $10,000 due on the second contract would be for labor and materials benefiting all 264 units, not just the 132 unstarted units on which the lien would remain. Consequently, the operation of the release provisions of § 55-79.46(b) demonstrates that plaintiff seeks a lien upon property not benefited by the plaintiff's efforts.

■ Accordingly, we hold that under these circumstances, where work has been done and materials furnished under two separate and distinct contracts which added disproportionate values to the properties liened, a memorandum which fails to apportion the amounts due between the several properties benefited is defective and the lien void. Under these facts, two separate liens should have been recorded — one against the first 132 units and their appurtenant common elements for $34,846 and the second against the entire project for $10,086.

For the foregoing reasons the action of the trial court in sustaining the demurrer and declaring the lien void will be affirmed. However, the judgment dismissing the intervening petition will be reversed and the suit will be remanded for further proceedings on the plaintiff's alternative prayer that, if the lien be adjudged invalid, it be granted a money judgment against the developer for the amount due.

*Affirmed and remanded.*