## Richmond

UNIT OWNERS ASSOCIATION OF
BUILDAMERICA-1, A CONDOMINIUM

V.

HARRY F. GILLMAN, ET UX.

June 18, 1982.

Record No. 800180.

HARRY F. GILLMAN AND SAUNDRA K. GILLMAN

V.

UNIT OWNERS ASSOCIATION OF BUILDAMERICA-1, A CON-
DOMIUM, JOHN R. PFLUG, JR., TRUSTEE, AND BOARD OF
MANAGERS OF THE UNIT OWNERS ASSOCIATION OF
BUILDAMERICA-1

June 18, 1982.

Record No. 800171.

Present: Carrico, C.J., Cochran, Poff, Compton, Stephenson, and Russell, JJ., and
Harrison, Retired Justice.

*David C. Canfield (Tolbert, Smith, FitzGerald & Ramsey,* on brief) for appellant. (Record No. 800180).
*Fredrick H. Goldbecker* for appellees. (Record No. 800180).
*Fredrick H. Goldbecker* for appellant. (Record No. 800171).
*David C. Canfield (Tolbert, Smith, FitzGerald & Ramsey,* on brief), for appellees. (Record No. 800171).

HARRISON, R.J., delivered the opinion of the Court.

The Unit Owners Association of BuildAmerica-1, a condominium, filed its bill to enforce liens recorded against condominium units owned by Harry F. Gillman and Saundra K. Gillman based upon fines it had levied for alleged violations by them of its rules and regulations. It also sought to enjoin the Gillmans from bringing their garbage trucks onto the common elements of the condominium. The Gillmans filed their bill against the Board of Managers of the Association, seeking a declaratory judgment of their rights under the bylaws of the Association, injunctive relief, and the recovery of damages. The causes were consolidated, and upon trial, the lower court found the provision in the bylaws of the Association providing for the collection of fines to be unlawful, unconstitutional, and therefore unenforceable. The court did grant the Association certain injunctive relief and a judgment for $1250, representing counsel fees incurred by it. The Association and the Gillmans noted appeals.

The Association contends here that Article III, paragraph 2(m) of its bylaws, providing for the levying of fines, is not unlawful or unconstitutional as violative of the due process guarantees of either the federal or state constitutions, and that the award made by the trial court of counsel fees is unreasonably low. The Gillmans contend on appeal that the trial court failed to construe properly the bylaws, rules, and regulations of the Association as applied to them; erred in not applying the equitable defense of laches and estoppel against the Association; and erred in granting an injunction order which lacked standards for compliance or ascertainable scope and which, because of its vagueness, will give rise to further litigation.

The condominium involved is located in the southern part of Fairfax County and is described as a single, large industrial structure comprised of twenty-six small warehouse or garage-type units, surrounded by a parking area. The paved, blacktop parking

area, which is a common element of the condominium, is designed to allow vehicles to drive around the entire length of the structure and to facilitate on-site parking in spaces which were lined off but undesignated.

The condominium was established under the Condominium Act, Code § 55-79.39, *et seq.*, by master deed of John R. Pflug, Jr., dated August 16, 1974, and recorded in Fairfax County along with the bylaws of the Association. Article 6 of the deed provides that "[a]ll present and future owners, tenants, visitors and occupants of units shall be subject to, and shall comply with the provisions of this deed, the By-Laws and Rules and Regulations . . . [of the condominium] as they may be amended from time to time." The deed stipulates that the condominium shall be administered by an Association whose membership is comprised of unit owners.

Article III, Section 2 of the bylaws of the Association prescribes the powers and duties of its Board of Managers to include the operation, care, upkeep, and maintenance of the common elements, controlling the general use of all common elements, and taking all other necessary action for the sound management of the condominium. Article V, Section 11(c) enumerates certain restrictions on the use of units, and provides that "[n]o nuisances shall be allowed on the Condominium nor shall any use or practice be allowed which is a source of reasonable annoyance or which unreasonably interferes with the peaceful possession or proper use of the Condominium by its owners and occupants." Regulation 15 for the Condominium provides that "[n]o noxious or offensive activity shall be carried on in any Unit or in the common elements, nor shall anything be done therein, either willfully or negligently, which may be or become an annoyance or nuisance to the other Unit Owners or occupants."

By deed dated July 12, 1976, the Gillmans purchased Unit 17, and one year later, on July 13, 1977, purchased Unit 21 of the condominium. In each deed are the following provisions:

> SUBJECT TO the reservations, restrictions on use, and all covenants and obligatons set forth in the Master Deed, dated August 16, 1974 and recorded in Deed Book 4088 at page 266 and as set forth in the By-laws of the Unit Owners Association attached thereto and as it may be amended from time to time, all of which restrictions, payments of charges and all

other covenants, agreements, obligations, conditions and provisions are incorporated in this Deed by reference and shall constitute covenants running with the land, to the extent set forth in said documents and as provided by law and all of which are accepted by the Grantees as binding and to be binding on the Grantees and their successors, heirs and administrators, executors and assigns or the heirs and assigns of the survivor of them, as the same may be.

AND the Grantors do hereby covenant and agree that the purpose for which the Unit may be used is for such uses as may be permitted under the zoning ordinances subject to such limitations as may be contained in the Master Deed and the By-laws of the Unit Owners Association.

The Gillmans, trading as Gillmans Five Star Trash Service, owned and operated a fleet of trash-collecting-trucks. From the date of their purchase of the units, and in the course of operating their business, they have been using these units and the common elements of the condominium as a location on which to repair, clean, and park overnight several of their vehicles. The Gillmans testified that they purchased the condominiums for this express purpose and that this purpose was clearly stated to Pflug, the grantor and declarant in the master deed, as well as to his employee, Roger Thornton. While this testimony was contradicted, it does appear that when the Gillmans purchased the last unit from the Association, Thornton wrote a letter for the Gillmans to sign, requesting a loan from a local bank to finance their purchase, and setting forth in the letter that the intended use of the condominium was for a storage facility for the Gillmans' commercial vehicles and trash receptacles used in their business. Further, to encourage the Gillmans' purchase of the second unit, Pflug accepted a second deed of trust on the unit.

The Gillmans apparently conducted their operations out of their units without incident or complaint until the spring of 1978. Between May 2 and August 10, 1978, they received a series of four letters from the Association complaining about the manner in which they were parking vehicles, of oil and gas leakage from their trucks, and of offensive odors which emanated from the vehicles. They were finally ordered to remove their trucks from the condominium on or before June 12, 1978, or have the trucks phys-

ically removed by the Association and be subjected to a special assessment for the cost of removal.

On August 10, 1978, the Association, by its attorney, notified the Gillmans that it had imposed a fine on their units based upon their continuing violation of the bylaws, rules, and regulations of the Association. The fines were imposed pursuant to Article III, Section 2(m) of the bylaws, which gives the Board of Managers the power to:

> [Levy] fines against Unit owners for violation of the Rules and Regulations established by it to govern the conduct of the Unit owners, provided, however, that no fine may levied in an amount in excess of $25 for any one violation. But for each day a violation continues after notice, it shall be considered a separate violation. . . . Where a Unit owner is fined for an infraction of the Rules and Regulations and fails to pay the fine within 10 days after notification thereof, the Board may levy an additional fine or fines to enforce payment of the initial fine.

The Board of Managers imposed a fine of $25 against each truck for each day that such truck had allegedly "produced noxious odors on the Common Elements of the Condominium." The fine imposed for five trucks was $125 a day, a total of $8000 for the period June 7 through August 10, 1978. The Gillmans were also advised that if they did not pay the $8000 within ten days, an additional fine of $8000 would be imposed; and further, that the Managers would impose a similar $25 fine for each day that any truck continued to generate an intolerable odor while parked on the common elements.

This action by its counsel was formally ratified at a special meeting of the Board of Managers held August 31, 1978. At that meeting, counsel explained Virginia's Condominium Act to the Managers, with particular reference to "the right of assessment and the right to lien for failure to pay assessments based on the unit owners pro rata portion of condominium expenses." It was his opinion that the Association had "a sound foundation for assessing against Gillmans' and [recovering] the cost of attorney's fees if we do prevail." However, he advised the Board that "it's a matter of Gillmans' attorney's theory versus our theory of the condominium act." At this meeting, the Board also amended the Association's

rules and regulations to provide that no unit owner be allowed to maintain on the condominium property more than three trucks per unit with an empty weight of 10,000 pounds or over.

The Gillmans did not pay the $8000 fine within ten days, and the Board levied an additional fine of $8000. Ultimately it levied fines totaling $20,500 on the Gillmans for their alleged violations and filed memoranda of liens in that amount in the Clerk's Office of Fairfax County, pursuant to Code § 55-79.84(a) (1979 Cum. Supp.), which provides, in part:

> The unit owners' association shall have a lien on every condominium unit for unpaid assessments levied against that condominium unit in accordance with the provisions of this chapter and all lawful provisions of the condominium instruments. . . .

On November 2, 1978, the Association filed its suit to enforce the liens and enjoin the Gillmans from parking their trucks on the common elements. The next day the Gillmans filed suit for a declaratory judgment.

The condominium is built in a zone that permits the operation of a trash-and-garbage-collection-business such as that conducted by the Gillmans. There is nothing in the master deed, or in the bylaws, which prohibited a sale by Pflug of one or more units for use by a purchaser in conducting such a business, and in using, repairing, and storing vehicles in connection therewith. Purchasers of other units from Pflug were charged with knowledge of the permitted uses.

Although it may have been planned originally that each unit owner would be allocated four parking spaces per unit, this understanding admittedly was not observed by the various unit owners. Prior to August 31, 1978, there were no restrictions or limits on the number of vehicles that each unit owner could own, use, store, or park in the units or on the common elements. The Association fined the Gillmans because their trucks caused an "odoriferous nuisance" in that they "produced noxious odors on the common element of the condominium," which were "offensive and intolerable to the other unit owners."

The Gillmans deny that they operated their business or trucks in the manner alleged by the Association; admit that they have parked their trucks on the common elements of the condominium;

and claim that they have a vested property right to do so. They testified that the Association had made no objection for more than two years to the manner in which they had operated their business, and emphasize the conveyance to them of a second unit after they had been conducting a garbage-and-trash-collecting-business from their first unit for a full year. They further say their business was being operated in compliance with the zoning laws of Fairfax County and consistent with uses of other unit owners and owners of surrounding properties. At trial, the Gillmans introduced copies of numerous inspection reports made by representatives of Prince William and Fairfax Counties reflecting the cleanliness of the trucks and full compliance with all health regulations.

John T. Summers, an inspector for the Fairfax Health Department, was accepted as an expert witness. He had inspected the Gillmans' operation some twenty-five times. He said the Gillmans had cooperated fully with the Health Department, and he found no violations and observed no significant health hazards. When asked to evaluate the cleanliness of the Gillmans' trucks in comparison to those of other such companies, Summers stated they "were no better nor no worse" than other trash trucks. He testified that on warm humid days he had noted some odor from the trucks, but this was only when one was close to a truck, and even then he found the odor slight.

Four unit owners, members of the Board of Managers, testified that they detected offensive odors emanating from the Gillman trucks. Carl Moorefield said that he could smell "rotten garbage" from the front of his unit even when the Gillman trucks were not on the premises. He also said that the trucks leaked oil and hydraulic fluid and caused damage to the surface of the driveway area. Moorefield admitted that he had seen heavy vehicles, other than those of the Gillmans', on the common elements of the condominium, and that he routinely had ten or eleven employee automobiles associated with his operation parked on the common elements during the day.

Board member William Crawford testified that to his knowledge "at least five trucks were parked [by the Gillmans] on the premises every day." Crawford said the trucks were leaking oil and hydraulic fluid on the parking area and they were often parked and repaired in the driveway area, thereby interfering with other vehicles. He complained of an odor emitted by the trucks

and said that he had seen maggots on the pavement which he attributed to the Gillman trucks.

William Rydell, unit owner, operated a retail automobile glass shop. He said that the odor of the Gillman trucks bothered his customers more than it bothered him. He admitted that while the Gillman trucks sometimes leaked oil and hydraulic fluid, his own trucks "leaked some of the same," the difference apparently being one of degree. He said that while the Gillman trucks caused congestion, everyone at the condominium caused congestion to others at some time or another. Rydell regularly used seven or eight trucks in his business.

Pflug testified that he then owned only one unit of the condominium and that it was rented. He said that when the Gillmans' problem was brought to this attention, he visited the condominium and found the odor nauseating. In characterizing the Gillman trucks, he said "they stink."

No condominium shall come into existence in Virginia except on the recordation of condominium instruments pursuant to the provisions of Chapter 4.2 of the Code of Virginia, cited as the Condominium Act. Code § 55-79.39, *et seq.* The entire condominium concept, and all pertaining to it, is therefore a statutory creation. For a review of the historical background and nature of this method of real estate ownership, Virginia's present Condominium Act, and its predecessor, the Horizontal Property Act, Acts 1962, c. 627, reference is made to Mr. Justice Compton's opinion in *United Masonry* v. *Jefferson Mews,* 218 Va. 360, 237 S.E.2d 171 (1977).

We consider first the Association's assignment which questions the action of the trial court in setting aside as unlawful the fines levied against the Gillmans. The Association argues that the requirement of the Condominium Act (Code § 55-79.73(a)) that "a set of bylaws providing for the self-government of the condominium by an association of all the unit owners" is designed to foster the evolution of a condominium into "a self-governing community" and a "fully self-governing democracy." It argues that there is no limitation inherent in the Condominium Act on the powers that may be created by the condominium documents, relying upon Code § 55-79.80(c), which provides: "This section shall not be construed to prohibit the grant, by the condominium instruments, of other powers and responsibilities to the unit owners' association or its executive organ."

The Association further contends that consistent with "the deference to the condominium documents" that appears throughout the Condominium Act, Virginia Code § 55-79.84 does not limit the lien it permits to assessments levied "in accordance with the provisions of this chapter," but extends the lien also to assessments levied "in accordance with the provisions . . . of the condominium instruments." It maintains that since the bylaws of the Association give its Board of Managers the power to levy a fine against a unit owner, and to collect such fine as if it were a common charge, every unit owner purchased subject to this power.

▮ We do not agree that it was ever the intent of the General Assembly of Virginia that the owners of units in a condominium be a completely autonomous body, or that such would be permitted under the federal and state constitutions. Admittedly, the Act is designed to and does permit the exercise of wide powers by an association of unit owners. However, these powers are limited by general law and by the Condominium Act itself. Code § 1-13.17 provides that "[w]hen . . . any . . . number of persons, are authorized to make . . . bylaws, rules, regulations . . . it shall be understood that the same must not be inconsistent with the Constitution and laws of the United States or of this State." The Condominium Act also sets limits on the powers that may be created by the Condominium documents. All unlawful provisions therein are void. Code § 55-79.52(a). "Common expenses" mean expenditures lawfully made or incurred. Code § 55-79.41(b).

▮ We find no language in the Condominium Act which authorizes the executive or governing body of a condominium to levy fines, impose penalties, or exact forfeitures for violation of bylaws and regulations by unit owners. Code § 59-79.83 provides in detail the various circumstances under which common expenses associated with the maintenance, repair, renovation, restoration, or replacement of any common element shall be assessed. Code § 55-79.84 provides that a unit owners' association shall have a lien on every condominium unit for unpaid *assessments* levied against that condominium unit in accordance with the provisions of the Condominium Act and all *lawful provisions* of the condominium instrument.

The Condominium Act provides the manner in which an association shall compel compliance with condominium instruments. Code § 55-79.53 reads as follows:

The declarant, every unit owner, and all those entitled to occupy a unit shall comply with all lawful provisions of this chapter and all provisions of the condominium instruments. Any lack of such compliance shall be grounds for an action or suit to recover sums due, for damages or injunctive relief, or for any other remedy available at law or in equity, maintainable by the unit owners' association, or by its executive organ or any managing agent on behalf of such association, or, in any proper case, by one or more aggrieved unit owners on their own behalf or as a class action.

The statute does not purport to grant an association the power to secure compliance with its bylaws, rules, and regulations by the imposition of a fine or the exaction of a penalty. The accepted definition of "fine" is found in Black's Law Dictionary 569 (5th ed. 1979), and is as follows:

To impose a pecuniary punishment or mulct. To sentence a person convicted of an offense to pay a penalty in money.

A pecuniary punishment imposed by lawful tribunal upon person convicted of crime or misdemeanor. A pecuniary penalty. It may include a forfeiture or penalty recoverable in a civil action, and, in criminal convictions, may be in addition to imprisonment.

The Condominium Act authorizes assessments, not fines. The term "assessment" is in no way synonymous with the word "fine" or the word "penalty." Assessment is defined in Black's, *supra*, at p. 106, as follows:

In a general sense, the process of ascertaining and adjusting the shares respectively to be contributed by several persons towards a common beneficial object according to the benefit received. A valuation or a determination as to the value of property. . . .

■ The imposition of a fine is a governmental power. The sovereign cannot be preempted of this power, and the power cannot be delegated or exercised other than in accordance with the provisions of the Constitutions of the United States and of Virginia. Neither can a fine be imposed disguised as an assessment.

■ The controversy here arose over the alleged objectionable manner in which the Gillmans were conducting their business from their privately owned units and on the common elements in which they jointly had an interest with other unit owners. The trucks emitted an offensive odor, as would be expected of trucks that haul garbage and are periodically disinfected. However, the Gillmans were operating a lawful business in a permitted zone and apparently to the satisfaction of the health authorities of two counties. They maintained that they were complying with the law and with the bylaws, rules, and regulations of the Association. Assuming that the Gillman trucks, and their mode of operation, created noxious and offensive odors and amounted to a nuisance, Code § 55-79.53 provided the Association with a remedy to correct the condition and obtain compliance with its bylaws and regulations. Instead of proceeding in that manner and having the rights of the respective parties determined as provided by law, the Board of Managers called a special meeting, the four members who attended decided what they objected to was a "nuisance," *fined* the Gillmans $20,500, and encumbered their property. The mischief that could be wrought if it were constitutionally permissible for a condominium association to levy fines on and exact penalties of unit owners is dramatically illustrated by this case. Pflug frankly admitted that he regretted selling any units to the Gillmans, and said the sale was ". . . a bad deal . . . the worst one I've ever made" and that the only way to solve the pavement problem was "to get rid of all Gillmans' trucks." Moorefield, another member of the Board "fining" the Gillmans, testified that the imposition of fines better served the purpose of getting the Gillmans out of the condominium since the only way this could be accomplished was to "ruin them." We think it clear that the Gillmans were being punished, not assessed, and hold the action of the Association to have been impermissible.

We now turn our attention to the Gillmans' assignments of error in which they question the action of the Association in amending its rules and regulations. They allege that their purchases of units were made after full disclosure of their intended use to the declarant Pflug, that their use of the property was in accordance with the zoning ordinance and with the understanding they had of permitted uses, and that their continued and alleged reasonable use of the common elements for the repair and parking of their trash collection vehicles was ratified by the Association. They ar-

gue that their business has been conducted in compliance with "industrial standards" and that to now apply the words "noxious" or "nuisance" to such operation amounts to a retrospective reinterpretation of the condominium documents. They object to the amendment to the rules and regulations attempting to reduce the number of trucks the Gillmans are allowed on the parking area. They regard such amendment as destructive of their alleged vested right to continue to use the same number of spaces as they were permitted to use at the time of their respective purchases. The specific regulation or restriction of which the Gillmans complain is that enacted by the Managers of the Association on August 31, 1978, decreeing that no unit owner be allowed to maintain on the condominium property more than three trucks per unit with an empty weight of 10,000 pounds or over.

The narrow issue is the right of a condominium association to amend its rules, regulations, and bylaws from time to time. As we have heretofore pointed out, the bylaws of the Association recorded with the master deed expressly provide for such amendments. And the master deed conveyed the units to the Gillmans with the express understanding that the rules, regulations, and bylaws of the Association were subject to amendment. The power exercised by the Association is contractual in nature and is the creature of the condominium documents to which all unit owners subjected themselves in purchasing their units. It is a power exercised in accordance with the private consensus of the unit owners. While the unit owners are vested with an undivided interest in the common elements, the authority to control the use of the common elements is vested in the Association by the condominium documents and such amendments thereof as may thereafter be adopted.

A regulation which restricts the use of parking spaces and the weight of vehicles permitted to occupy such spaces is in no sense a zoning regulation adopted under the police power. Rather, when adopted lawfully and reasonably, it becomes a mutual agreement entered into by the condominium unit owners. A prospective purchaser of a unit is charged with notice of the contents of the master deed and of the bylaws and therefore has the option at the time of purchase to determine whether to sign an agreement and purchase a unit with such a restriction or limitation. It has been universally held that reasonable restrictions concerning use, occupancy, and transfer of condominium units are necessary

for the operation and protection of the owners in the condominium concept. The necessity for such restrictions on condominium living was aptly explained in *Hidden Harbour Estates, Inc.* v. *Norman,* 309 So.2d 180, 181-82 (Fla. Dist. Ct. App. 1975). The court adopted a test of reasonableness to determine the validity of association regulations and said:

It appears to us that inherent in the condominium concept is the principle that to promote the health, happiness, and peace of mind of the majority of the unit owners since they are living in such close proximity and using facilities in common, each unit owner must give up a certain degree of freedom of choice which he might otherwise enjoy in separate, privately owned property. Condominium unit owners comprise a little democratic sub society of necessity more restrictive as it pertains to use of condominium property than may be existent outside the condominium organization. . . . Certainly, the association is not at liberty to adopt arbitrary or capricious rules bearing no relationship to the health, happiness and enjoyment of life of the various unit owners. On the contrary, we believe the test is reasonableness. If a rule is reasonable the association can adopt it; if not, it cannot. It is not necessary that conduct be so offensive as to constitute a nuisance in order to justify regulation thereof. Of course, this means that each case must be considered upon the peculiar facts and circumstances thereto appertaining.*

* Subsequent to its opinion in *Norman,* that court took occasion to protest the manner in which the word "reasonable" used in its decision had been interpreted. In *Hidden Harbour Estates, Inc.* v. *Basso,* 393 So.2d 637, 639-40 (Fla. Dist. Ct. App. 1981), the court pointed out that there are essentially two categories of cases in which a condominium association attempts to enforce rules of restrictive uses. It said that in the first category dealing with restrictions found in the declaration of condominium itself, "the restrictions are clothed with a very strong presumption of validity which arises from the fact that each individual unit owner purchases his unit knowing of and accepting the restrictions to be imposed. . . ." It held that "[s]uch restrictions are very much in the nature of covenants running with the land and they will not be invalidated absent a showing that they are wholly arbitrary in their application, in violation of public policy, or that they abrogate some fundamental constitutional right. . . ." Continuing, it held that in the second category of cases, "where a use restriction is not mandated by the declaration of condominium per se, but is instead created by the board of directors of the condominium association, the rule of reasonableness comes into vogue. The requirement of 'reasonableness' in these instances is designed to somewhat fetter the discretion of the board of directors. . . ."

A condominium restriction or limitation, reasonably related to a legitimate purpose, does not inherently violate a fundamental right and may be enforced if it serves a legitimate purpose and is reasonably applied.

While our attention has not been drawn to any Virginia case in point, a number of cases in other jurisdictions have upheld the right of a unit owners' association to add or to change its rules and regulations governing activities within the condominium. *See also* Code § 55-79.73. In *Norman, supra,* an association adopted a rule prohibiting the use of alcoholic beverages in certain areas of the common elements. *Ritchey* v. *Villa Neuva Condominium Ass'n,* 81 Cal. App.3d 688, 146 Cal. Rptr. 695 (1978), approved the prohibition of residents under eighteen years old. In *Ryan* v. *Baptiste,* 565 S.W.2d 196 (Mo. App. 1978), a regulation provided for the installation of locks on common elements to restrict access. And in *Coquina Club* v. *Mantz,* 342 So.2d 112 (Fla. Dist. Ct. App. 1977), and *Riley* v. *Stoves,* 22 Ariz. App. 223, 526 P.2d 747 (1974), age restrictions on the occupants of condominiums withstood attack. In *Riley,* the court found the age restrictions reasonably related to a legitimate purpose and declined to hold that their enforcement violated the defendant's right to equal protection.

In the instant case, there was originally no limitation or restriction on the size, type, or weight of vehicles that could be parked on the common elements of the condominium. However, this fact did not give each unit owner the unfettered and vested right to use the common elements in whatever manner he chose, or to occupy an unlimited number of spaces. The necessity for a regulation governing the number of spaces to which each unit owner is entitled and the weight of vehicles was probably not of importance at a time when all the units were not occupied. But with the sale and occupancy of all units, and with changes in methods of operation, it may become necessary and reasonable for some rules and regulations to be adopted concerning the allocation and use of parking spaces and possibly the weight of vehicles to be parked on the common elements.

It is our conclusion that amendments to condominium restrictions, rules, and regulations should be measured by a standard of reasonableness, and that courts should refuse to enforce regulations that are found to be unreasonable. In doing so, inquiry must be made whether an association has acted within the scope of its authority as defined under the Condominium Act and by its

own master deed and bylaws, and whether it has abused its discretion by promulgating arbitrary and capricious rules and regulations bearing no relation to the purposes of the condominium.

The condominium involved in the instant case is not a residential condominium but one designed for industrial uses. Any rule or regulation adopted by the Association cannot ignore the purposes for which the condominium was created and the intended uses by the purchasers of units in the condominium. Whether a regulation restricting each unit owner to three parking spaces is reasonable depends upon the number of spaces that are available in the parking area, the traffic in and around the condominium, and numerous other factors. In determining the reasonableness of a weight restriction, the Association would necessarily have to consider, among other things, the type, size, and weight of vehicles normally used in the businesses conducted therefrom by the unit owners, as well as the potential damage such vehicles could do to the common elements. A unit owner could be regulated out of business by an unreasonable and unrealistic weight restriction imposed on his vehicles by other unit owners or their boards of managers.

By the same token, the operator of a business out of a condominium must operate with due regard to the rights of neighboring unit owners and the effect his operation has on the business of others. While some odor from the disinfectant or otherwise will most likely emanate from any garbage truck, nevertheless it is obvious that a trash-collecting-business cannot be operated from a condominium with the same freedom as from an isolated rural area. Because of varying facts and circumstances in each case, the courts have universally adopted the standard of reasonableness in their review of condominium rule making.

In its bill of complaint, the Association sought to permanently enjoin the Gillmans from allowing their garbage trucks on the common elements of the condominium "for any purpose whatsoever." The trial court enjoined the Gillmans from (1) "maintaining, parking, or retaining their trash collecting vehicles on the premises or common areas until the trucks had been washed thoroughly with a disinfectant/insecticide substance designed to reduce odor and kill insects," and (2) "from having, keeping, parking, or maintaining at any given time any vehicles in any Unit or Common Area of . . . [the] Condominium in excess of the number permitted by the Rules and Regulations of the Condominium."

An injunction is an extraordinary remedy. An injunctive order must be specific in its terms, and it must define the exact extent of its operation so that there may be compliance. It should set forth what is enjoined in a clear and certain manner and its meaning should not be left for speculation or conjecture.

We are unable to determine from the record before us the reasonableness of the regulation adopted by the Board of Managers of the Association restricting the number and weight of vehicles that may be parked on the common elements. We cannot tell from any rule or regulation in the record, or from the trial court's order, whether the Gillmans are permitted vehicles in their two units as well as in six parking spaces, or whether their number of vehicles is restricted to a maximum of six under any circumstances. Further, it appears that at the time the regulation was adopted, the Gillmans' business required the use of eleven vehicles, nine having an empty weight of more than 10,000 pounds. It may be impossible for the Gillmans to operate a business if the number and weight of vehicles that they could service, or have available to inspect or service in any one day, were unduly restricted. This must be considered in making any determination of reasonableness and whether the regulation serves a legitimate purpose or is arbitrary and oppressive in its application.

The order of the lower court enjoining the Gillmans from maintaining or parking their vehicles on the premises or common elements until the trucks have been washed thoroughly with a disinfectant/insecticide substance "designed" to reduce odor and kill insects provides no realistic standard for compliance. We cannot conceive of any disinfectant or insecticide, however worthless or ineffective it may be, that is not "designed" to reduce odor or kill insects. How many washings and how often would amount to compliance with the order? And would running a garbage truck through a car-wash be thorough enough? The order would inevitably promote litigation and possibly a contempt proceeding. Further, there has been no finding of fact by the court below that the Gillmans' operation created "the intolerable nuisance" which resulted in "the irreparable loss by the members of the Association of the use and enjoyment of their property," as alleged in the Bill.

We find no merit in the Gillmans' assignment which raises the equitable defense of laches and estoppel against the Association. We do not address the question of the adequacy of attorney's fees, the Gillmans having substantially prevailed. Accordingly, we

affirm the decree of the court below directing that fines levied on the Gillmans by the Association be set aside and vacated, and the assessment liens released of record. The action of the court below granting the injunctions is reversed, and the injunctions are dissolved. The trial court's allowance of a fee to counsel for the Association is reversed. The case is remanded for further proceedings not inconsistent with the views expressed in this opinion.

*Affirmed in part, reversed in part, and remanded.*