PUBLISHED

## VIRGINIA:

*In the Court of Appeals of Virginia on* **Tuesday** *the* **19th** *day of* **December, 2023**.

Telegraph Square II, a Condominium Unit Owners Association,                                                  Appellant,

 against                    Record No. 0222-22-4
                             Circuit Court No. CL-2019-0012054

7205 Telegraph Square, LLC,                                                                                    Appellee.


From the Circuit Court of Fairfax County


In accordance with the unpublished order of this Court entered on December 19, 2023, the stay of this Court's April 25, 2023 mandate is lifted and the judgment of the trial court remains affirmed.

This order shall be published and certified to the trial court.


A Copy,

Teste:

A. John Vollino, Clerk

By:       *original order signed by a deputy clerk of the Court of Appeals of Virginia at the direction of the Court*

Deputy Clerk

PUBLISHED

*VIRGINIA:*

*In the Court of Appeals of Virginia on* **Tuesday** *the* **6th** *day of* **June, 2023**.

Telegraph Square II, a Condominium Unit Owners Association, Appellant,

against        Record No. 0222-22-4
Circuit Court No. CL-2019-0012054

7205 Telegraph Square, LLC, Appellee.

Upon a Petition for Rehearing En Banc

Before Chief Judge Decker, Judges Humphreys, Beales, Huff, O'Brien, AtLee, Malveaux, Athey, Fulton, Ortiz, Causey, Friedman, Chaney, Lorish, Callins, and White

On May 9, 2023 came the appellant, by counsel, and filed a petition requesting that the Court set aside the judgment rendered herein on April 25, 2023, and grant a rehearing *en banc* on the issue(s) raised in the petition.

On consideration whereof and pursuant to Rule 5A:35 of the Rules of the Supreme Court of Virginia, the petition for rehearing *en banc* is granted and the appeal of those issues is reinstated on the docket of this Court. The mandate previously entered herein is stayed pending the decision of the Court *en banc*.

The parties shall file briefs in compliance with the schedule set forth in Rule 5A:35(b). The appellant shall attach as an addendum to the opening brief upon rehearing *en banc* a copy of the opinion previously rendered by the Court in this matter. An electronic version of each brief shall be filed with the Court and served on opposing counsel.[1]

A Copy,
Teste:

A. John Vollino, Clerk

By: *original order signed by a deputy clerk of the Court of Appeals of Virginia at the direction of the Court*
Deputy Clerk

---

[1] The guidelines for filing electronic briefs and appendices can be found at www.courts.state.va.us/online/vaces/resources/guidelines.pdf.

Present: Judges Athey, Ortiz and Chaney
Argued at Winchester, Virginia

PUBLISHED

TELEGRAPH SQUARE II,
  A CONDOMINIUM UNIT OWNERS ASSOCIATION

                                                OPINION BY
v.       Record No. 0222-22-4        JUDGE VERNIDA R. CHANEY
                                            APRIL 25, 2023

7205 TELEGRAPH SQUARE, LLC


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Randy I. Bellows, Judge

Ted A. Hages (James C. Martin; Colin E. Wrabley; Grayson P.
Hanes; Robert M. Diamond; Katherine E. Sheffield; Reed Smith
LLP, on briefs), for appellant.

David C. Gutkowski (James P. Miller; Odin, Feldman & Pittleman,
P.C., on briefs), for appellee.

*Amicus Curiae*: Washington Metropolitan Chapter Community
Associations Institute (Andrew J. Terrell; Chad Rinard; Whiteford,
Taylor Preston LLP, on brief), for appellant.


Following a bench trial in the Fairfax County Circuit Court (trial court), Telegraph

Square II Condominium Owners Association ("appellant" or the "Condominium Association")

appeals from the trial court's judgment for the plaintiff, 7205 Telegraph Square, LLC

("appellee-plaintiff" or "7205 Telegraph"), on all four counts of appellee-plaintiff's second

amended complaint. 7205 Telegraph owns all three commercial condominium units in Phase IV

of the Condominium Association's development in Fairfax County (the Condominium). The

trial court held that the Condominium Association breached its contract with 7205 Telegraph,

violated the Condominium Act, Code §§ 55.1-1900 through 55.1-1995, and violated Fairfax

County zoning ordinances when it excluded 7205 Telegraph from all common elements in

Phase I of the Condominium—including the parking lot—by assigning all common elements in Phase I exclusively to Phase I unit owners.

The Condominium Association contends on appeal that the trial court erred in: (1) finding that the Condominium Association's new parking regime violated the Fairfax County zoning ordinance, (2) finding that the new parking regime proximately caused 7205 Telegraph to lose a tenant, (3) awarding lost-rent contract damages based on 7205 Telegraph's loss of a tenant because those damages were speculative, consequential damages foreclosed by Virginia law, (4) failing to address the Condominium Association's mitigation of damages defense, and (5) ruling that 7205 Telegraph was (i) improperly assessed fees for the use, maintenance, and repair of Phase I common elements and (ii) entitled to attorney fees as the prevailing party. Upon review, this Court finds no error and affirms the trial court's judgment.

BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the prevailing party at trial." *Norfolk S. Ry. Co. v. Sumner*, 297 Va. 35, 37 (2019).

A.  *The Condominium Instruments*

The Condominium Association was established by condominium instruments— principally the Declaration and Bylaws—recorded in the Fairfax County land records in August 1990 (Condominium Instruments).  Section 5.11 of the Bylaws addresses parking at the Condominium as follows:

> *Parking Spaces*.  Until assigned as limited common elements, all parking spaces shall be used by the unit owners for self-service parking purposes on a "first come, first served" basis except as the Board of Directors may otherwise determine.  The cost of maintenance and repair of all parking areas shall be a common expense.

Section 5.8(a)(3) of the Bylaws, which also pertains to parking schemes at the Condominium, provides that "all valid laws, zoning ordinances and regulations of all governmental agencies having jurisdiction thereof shall be observed," and "[a]ll laws, orders, rules, regulations or requirements of any governmental agency having jurisdiction thereof relating to any portion of Property shall be complied with."

Section 3.2 of the Condominium Declaration relates to *reserved common elements* and provides:

> *Reserved Common Elements*. The Board of Directors shall have the power in its discretion from time to time to grant revocable and/or conditional licenses in designated common elements to the Association or to any unit owners and to establish a reasonable charge to such unit owners for the use and maintenance thereof. Such designation by the Board shall not be construed as a sale or disposition of the common elements.

Similarly, Article 3, § 3.1(p) of the Bylaws provides that the Board has the power "[i]n its sole discretion, from time to time to designate certain common elements as reserved common elements and impose such restrictions and conditions on the use thereof as the Board of Directors deems appropriate."

At the time of trial, the Condominium included five phases. Phase I was established by the first and second amendments to the Condominium Instruments. No limited common elements are provided for Phase I. The third amendment added Phases II, III, and IV. Section 5 of the third amendment provides:

> All portions of the land added hereby that are not part of the units shall be *Limited Common Elements* appurtenant to the Units created hereby as hereafter described. All of the land in Phases II and III, not converted into units shall be *limited common elements* appurtenant to all of the Units in Phases II and III (Units 7225A and 7225B). All of the land in Phase IV, not converted into units shall be *limited common elements* appurtenant to all of the Units in Phase IV (Units 7205A, 7205B, and 7205C [the Phase IV Units]).

(Emphases added). The fourth amendment added Phase V to the Condominium and contained substantially similar language to § 5 of the third amendment. The Condominium Instruments, as amended, do not reserve any portion of the Phase I common elements for the use of Phase I units only.

Under the third and fourth Amendments to the Condominium Instruments, the Phase IV units were assigned specific percentage interests in the Condominium's common elements and limited common elements. The fourth amendment assigned specific percentage interests in the common elements as follows: Unit 7205A was assigned 8.7128% interest; Unit 7205B was assigned 6.5346% interest; and Unit 7205C was assigned 7.0791% interest. The third amendment assigned specific percentage interests in the limited common elements as follows: Unit 7205A was assigned 9.2637% interest; Unit 7205B was assigned 6.9478% interest; and Unit 7205C was assigned 7.5267% interest. The third amendment also asserted that "the responsibility to maintain, repair, and replace all portions of the limited common elements created hereby shall be that of the owner(s) of the Units to which the limited common elements are appurtenant."

The Bylaws, Article 1, § 1.3(d), define *limited common expenses* to mean "expenses separately assessed against one or more but less than all of the condominium units . . . pursuant to Bylaws, Article 5, Section 5.1(c)(2), and the Condominium Act." The Bylaws, Article 5, § 5.1(c)(2), provide that "any common expenses paid or incurred for the benefit of less than all the condominium units shall . . . be specially assessed against the condominium unit or units involved to the extent each is thereby benefitted." Also, the Bylaws, Article 5, § 5.2, provide that "[n]o unit owner may be exempted from liability for the assessment of common expenses by waiver of the use or enjoyment of any of the common elements or by abandonment or such unit owner's unit."

Pursuant to § 9.1(b) of the Bylaws, "[i]n any proceeding arising out of any alleged default by a unit owner, the prevailing party shall be entitled to recover the costs of such proceeding and such reasonable attorney's fees as may be determined by the court."

### B. Condominium Parking

The site plan for the Condominium ("the site plan"), approved by Fairfax County in June 1995, requires that Phase IV unit owners be provided at least 30 reserved parking spaces. The site plan also provides that Phase I unit owners must be provided 40 parking spaces; Phase II and Phase III unit owners, collectively, must be provided 18 parking spaces; and Phase V unit owners must be provided 20 parking spaces.

The site plan was prepared by Harold Logan, whom the trial court recognized as an expert in land surveying and civil engineering. Logan testified at trial that the requirement of a minimum of 30 parking spaces for Phase IV of the Condominium was necessary for compliance with the Fairfax County zoning ordinance. The Condominium Association's expert witness, a commercial real estate appraiser, testified that 7205 Telegraph's allocation of 12 parking spaces was less than the number required under the applicable zoning ordinance.

In June 1997, the board of directors for the Condominium Association (Board) decided to assign parking on a per-square-foot basis to each unit owner in the five phases of the Condominium. This parking regime existed in March 2003, when 7205 Telegraph purchased the three commercial condominium units in Phase IV, Units 7205-A, 7205-B, and 7205-C. The combined area of these three units is approximately 15,000 square feet, with 76% storage yard/warehouse space and 24% office space. According to the 2020 non-residential use permits for 7205 Telegraph's Phase IV units, the three units of 7205 Telegraph have approximately 3,750 square feet dedicated to office space use, and approximately 12,124 square feet dedicated to storage yard use. 7205 Telegraph owned an approximate 22.3% interest in the Condominium's

common elements and was assigned a proportionate share of parking spaces within the Condominium. For at least 15 years ending in October 2015, the Condominium Association reserved parking for Phase IV units within Phases IV and V. When 7205 Telegraph purchased its three units, 35 parking spaces were marked "Reserved 7205." Twelve of these reserved parking spaces were in Phase IV and 23 of these reserved parking spaces were located in Phase V.

In October 2015, the Board decided—by a 2-0 vote—to reallocate parking ("the 2015 parking re-allocation") by restricting parking for each unit owner to parking only inside the unit's designated phase, while still assessing fees for Phase I parking to unit owners in all five phases. The Board decided that "[t]he Limited Common Elements within [P]hases 2-5 will be restricted for the use of Phases 2-5 while the Common Elements will be allocated among the unit owners within Phase 1."

Under the 2015 parking re-allocation, parking was reallocated by (i) designating the common element parking in Phase I for the exclusive use of Phase I unit owners and (ii) requiring unit owners to park only in their designated phase. Although Phase I unit owners as a group accounted for 49% ownership of the Condominium's units, the 2015 parking re-allocation gave Phase I unit owners exclusive use of common element parking in Phase I, thereby diminishing 7205 Telegraph's undivided interest in the Condominium's common elements. Both Board members who voted for the new parking regime were Phase I unit owners who did not disclose any conflict of interest to other unit owners before they voted for the new parking regime.

Stephanie Tavares, a Board member and Phase I unit owner, testified at trial that under the Condominium's parking scheme at the time of trial, Phase I parking was a reserved common element, and parking in Phases II through V was a limited common element. Tavares further

testified that Phase I parking was reserved for Phase I unit owners and only Phase I unit owners could park in Phase I. However, as Tavares also testified, 7205 Telegraph was still assessed for the cost of maintenance, use, and expenses of the exclusive use area in Phase I. The Condominium Association's property manager and agent, John Motz, also testified that 7205 Telegraph is assessed for the maintenance, use, and expenses of the area reserved for Phase I unit owners only.

When the Board adopted the 2015 parking re-allocation, 7205 Telegraph was leasing two of its Phase IV condominium units to D&K Heavy Truck Repair, Inc. ("D&K"). D&K's five-year lease with 7205 Telegraph (2014 lease) was for a term beginning in September 2014 and ending in August 2019. The 2014 lease required 7205 Telegraph to provide D&K with the exclusive use of 20 parking spaces. The 2014 lease further required D&K to comply with the terms and provisions of the condominium documents attached to the 2014 lease. However, the 2014 lease qualified this requirement with 7205 Telegraph's covenant "not to amend the existing condominium documents in a manner that materially interferes with [D&K's] use of the premises or increases [D&K's] cost without [D&K's] consent."

D&K began to lose business after the 2015 parking re-allocation restricted parking for Phase IV units and reduced 7205 Telegraph's available parking to 12 spaces, including two handicapped spaces. Although Dennis McDaniel, the owner of D&K, complained about the shortage of parking spaces, the 2015 parking re-allocation made it impossible for William Akers, the managing member of 7205 Telegraph, to satisfy 7205 Telegraph's contractual obligation under the 2014 lease to provide D&K with the exclusive use of 20 parking spaces. In 2016, D&K and 7205 Telegraph attempted to reduce the deleterious impact of the Board's 2015 parking re-allocation by replacing the 2014 lease with an updated lease having more interior

square footage for vehicles (2017 lease).[1]  The updated 2017 lease, signed in December 2016, had a term beginning in January 2017 and ending in December 2021.  Under the terms of the 2017 lease, 7205 Telegraph was still required to provide D&K with exclusive parking rights to 20 parking spaces.

Despite the additional square footage provided in the 2017 lease, D&K continued to lose business due to the ongoing parking problems.  Consequently, D&K could no longer afford to pay its lease obligations to 7205 Telegraph.  Because D&K was suffering financially under the 2015 parking re-allocation and 7205 Telegraph wanted to avoid a lawsuit by D&K, Akers and McDaniel mutually agreed to terminate their commercial lease in 2017.

After 7205 Telegraph lost its commercial tenant, Akers unsuccessfully attempted to lease or sell 7205 Telegraph's Phase IV units.  However, due to uncertainty regarding the availability of parking caused by the 2015 parking re-allocation, 7205 Telegraph's listing agent could not sell or lease 7205 Telegraph's condominium units.

The 2015 parking re-allocation also diminished the value of 7205 Telegraph's condominium units by significantly reducing the number of parking spaces available to 7205 Telegraph.  William O'Neill, an expert commercial real estate appraiser, testified that he prepared an appraisal report with two estimates of the market value of 7205 Telegraph's Phase IV units.  On the assumption that 7205 Telegraph's Phase IV units had 30 available

---

[1] In the following testimony, Akers specifically stated that the purpose of the 2017 lease was to provide D&K with additional space to park vehicles after the 2015 parking re-allocation:

[Counsel]: What was the driving force behind entering into the [2017 lease]?

[Akers]:   The -- the first lease -- they were renting unit 7205 A, which was 6,000 square feet.  And speaking with D&K, they needed more space to park. And so the corner unit . . . is 7205 B.  It gave them more spaces to park to park the cars inside.

parking spaces, O'Neill estimated the market value of 7205 Telegraph's Phase IV units at

$2,225,000.  On the assumption that 7205 Telegraph's Phase IV units had 5 appurtenant parking

spaces, O'Neill estimated the market value of 7205 Telegraph's Phase IV units at $885,000.[2]

Between March 2017 and June 2019, 7205 Telegraph sent the Board multiple letters

objecting that the 2015 parking re-allocation was illegitimate and had caused 7205 Telegraph to

suffer significant monetary damages.  Because 7205 Telegraph believed it was over-assessed for

Phase I common elements, 7205 Telegraph stopped paying its condominium dues after

December 2017.  In response, the Condominium Association recorded liens on 7205 Telegraph's

properties in November 2019.  The Condominium Association also notified all unit owners by

email that it would be collecting a special assessment for legal fees incurred to (i) recover

outstanding dues, (ii) draft amendments to the condominium documents, and (iii) defend itself

against any suit by a unit owner.

In November 2019, the Condominium Association, by counsel, issued three letters to

7205 Telegraph, one for each of 7205 Telegraph's units in the Condominium.  Each letter was

identified as a "Notice of Acceleration."  These letters sought to collect unpaid dues, allegedly

delinquent assessments for common element and limited common element expenses, and special

---

[2] The Condominium Association's expert witness, a commercial real estate appraiser, estimated that the market value of 7205 Telegraph's Phase IV units with 15 parking spaces was $2,080,000, and the value with 34 parking spaces would be $2,190,000.  The Condominium Association's expert admitted on cross-examination that these estimates erroneously assumed that the Phase IV property was zoned I4 (not permitting heavy vehicle repair and maintenance) when the Phase IV property was actually zoned I5 (permitting heavy vehicle repair and maintenance).  *See* Fairfax County Zoning Ordinance, Art. 4, Use Regulations, Table 4101.1.

assessments for legal fees.  7205 Telegraph disputed the total amount of assessments imposed by the Board and refused to pay the full amount demanded.[3]

## C. Trial Court Rulings

Following a bench trial on 7205 Telegraph's second amended complaint, the trial court entered judgment for 7205 Telegraph on all four counts.  The trial court pronounced its judgment at a separate hearing in December 2021 and incorporated the transcript of that hearing in the final order.

The trial court held that the Board's adoption of the 2015 parking re-allocation breached the Condominium Association's contract with 7205 Telegraph, violated the Condominium Act, and violated the Fairfax County zoning ordinance.  On 7205 Telegraph's breach of contract claim, the trial court awarded 7205 Telegraph damages of $481,434.84.[4]

The trial court also granted 7205 Telegraph's request for a declaratory judgment against the Condominium Association and declared that the 2015 parking re-allocation was void because it violated the Condominium Instruments and the Condominium Act.  The trial court ordered the Condominium Association to immediately revoke its new parking regime regarding the Phase I parking common elements and remove all restrictions from the common element parking.

On Count III of the second amended complaint, the trial court held that the Condominium Association improperly assessed 7205 Telegraph for Phase I common elements from 2016 to 2021, the period during which the Condominium Association impermissibly excluded 7205 Telegraph from using Phase I parking.  The trial court ruled that 7205 Telegraph was

_____

[3] At the time of trial on 7205 Telegraph's complaint, the Condominium Association had three related actions against 7205 Telegraph pending de novo trials on appeal from the general district court.  The Condominium Association's actions against 7205 Telegraph related to allegedly delinquent assessments and were not consolidated with this case.

[4] For all monetary judgments entered, the trial court also ordered payment of interest accruing at the statutory judgment rate of 6% from the date the final order was entered.

over-assessed $51,074.18. The trial court entered a $6,296.70 judgment for 7205 Telegraph for over-assessments paid to the Condominium Association. The trial court also ordered that the liens recorded by the Condominium Association against 7205 Telegraph's properties are released.

On Count IV of the second amended complaint, the trial court held that the Condominium Association's special assessment of attorney fees and costs was improper because it cannot assess 7205 Telegraph for any costs of this litigation. The trial court ruled that under both the Condominium Instruments and the Condominium Act, 7205 Telegraph is entitled to an award of reasonable attorney fees and costs. The trial court entered an award of attorney fees and costs in favor of 7205 Telegraph for $324,977.60. This appeal followed.

## STANDARD OF REVIEW

"Under well-established principles, an issue of statutory interpretation is a pure question of law which we review de novo." *See Virginia Dep't of Tax'n v. R.J. Reynolds Tobacco Co.*, 300 Va. 446, 454 (2022) (citing *JSR Mech., Inc. v. Aireco Supply, Inc.*, 291 Va. 377, 383 (2016)). The trial court's application of a statute to its factual findings is also reviewed de novo. *See Cole v. Smyth Cnty. Bd. of Supervisors*, 298 Va. 625, 635 (2020). The trial court's interpretation and construction of the Telegraph Square Condominium Declaration and Bylaws is reviewed de novo. *See Virginia Fuel Corp. v. Lambert Coal Co.*, 291 Va. 89, 97-98 (2016) (trial court's interpretation of a contract is reviewed de novo); *Unit Owners Ass'n of Buildamerica-1 v. Gillman*, 223 Va. 752, 766 (1982) ("The power exercised by the [condominium unit owners'] Association is contractual in nature and is the creature of the condominium documents to which all unit owners subjected themselves in purchasing their units."). "We 'give deference to the trial court's findings of fact and view those findings in the light most favorable to . . . the prevailing party below.'" *R.J. Reynolds Tobacco Co.*, 300 Va. at

- 11 -

454 (quoting *Zelnick v. Adams*, 269 Va. 117, 123 (2005)). "[W]e view the evidence and all reasonable inferences arising therefrom in the light most favorable to the prevailing party at trial." *See McKee Foods Corp. v. Cnty. of Augusta*, 297 Va. 482, 495 (2019) (citing *Western Refining Yorktown, Inc. v. County of York*, 292 Va. 804, 808 (2016)). "When reviewing purely factual determinations, we ask whether they are 'plainly wrong or without evidence to support [them].'" *Grayson v. Westwood Buildings L.P.*, 300 Va. 25, 58 (2021) (alteration in original) (quoting Code § 8.01-680).

## ANALYSIS

### A. *The Condominium Association's 2015 parking re-allocation impermissibly converted common elements into limited common elements.*

In October 2015, the Board of the Condominium Association voted to reallocate the common element parking located in Phase I of the Condominium for the exclusive use of Phase I unit owners. Prior to the 2015 parking re-allocation, the Phase I common element parking was available to all condominium unit owners on a first-come, first-served basis. 7205 Telegraph contends, and the trial court found, that the 2015 parking re-allocation was intended to convert the Phase I common element parking into limited common elements for the exclusive use of Phase I unit owners. The Condominium Association contends that because it did not follow any of the required procedures for converting common elements to limited common elements, the 2015 parking re-allocation was, instead, a permissible designation of the Phase I common element parking as reserved common elements for the exclusive use of Phase I unit owners. We agree with the trial court's holding that the Board's 2015 parking re-allocation impermissibly converted the Phase I common element parking into limited common elements for the exclusive use of Phase I unit owners.

The trial court's interpretation of the terms *limited common element* and *reserved common element* are questions of law reviewed de novo. *See Eberhardt v. Fairfax Cnty. Emps.'*

- 12 -

*Ret. Sys. Bd. of Trs.*, 283 Va. 190, 194 (2012). The trial court's finding that the Board intended to convert the Phase I common element parking into limited common elements for the exclusive use of Phase I unit owners is a factual finding that will not be disturbed on appeal unless it is without supporting evidence or clearly erroneous. *See Ott v. L & J Holdings, LLC*, 275 Va. 182, 187 (2008) (determination of intent is a factual finding deferentially reviewed on appeal); *see also* Code § 8.01-680. The trial court's determination that the 2015 parking re-allocation illegally converted the Phase I common element parking into limited common elements is a mixed question of law and fact subject to de novo review with deference to any underlying factual findings. *See Commonwealth v. Davis*, 290 Va. 362, 368-69 (2015) (quoting *Loudoun Hosp. Center v. Stroube*, 50 Va. App. 478, 493 (2007)).

The Condominium Act defines *limited common element* as "a portion of the common elements reserved for the exclusive use of those entitled to the use of one or more, but less than all, of the units." Code § 55.1-1900. The Declaration, Article 3 § 3.1, designates a narrow class of common elements as limited common elements, providing that "[a]ny common elements designed to serve a single unit but located outside the boundaries thereof" are limited common elements. The Condominium Act does not define "Reserved Common Element." The Condominium Declaration, Article 3, § 3.2, captioned "Reserved Common Elements," provides:

> The Board of Directors shall have the power in its discretion from time to time to grant *revocable and/or conditional licenses* in designated common elements to . . . any unit owners and to establish a reasonable charge to such unit owners for the use and maintenance thereof.

(Emphasis added). The Bylaws, Article 1, § 1.3(h), define "Reserved Common Element" to mean "a common element in which the Board of Directors has granted a *revocable license* for

the exclusive use by less than all the unit owners." (Emphasis added).[5] The Condominium Association does not contend that the trial court misconstrued "limited common element" or "reserved common element."

The evidence supports the trial court's finding that the Condominium Association's 2015 parking re-allocation was intended to accomplish for Phase I unit owners the same exclusive access to parking appurtenant to their units as provided for the unit owners in the other phases. The minutes of the Board's meeting resulting in the 2015 parking re-allocation state in pertinent part:

> A motion was made to correct the allocation of parking in accordance with the Condominium Documents. The re-allocation of parking will begin immediately. The Limited Common Elements within phases 2-5 will be restricted for the use of Phases 2-5 while the Common Elements will be allocated among the unit owners within Phase 1. The motion was seconded. The motion carried with a vote of 2-0.

Thus, even though the Board's 2015 parking re-allocation did not expressly state that it was converting Phase I common element parking to limited common elements, the manifest intent of the re-allocation was to treat the Phase I common element parking the same as the limited common element parking areas in the other phases.

The Condominium Association does not dispute that it did not follow the procedures mandated by the Virginia Condominium Act to lawfully assign the Phase I common element parking as limited common elements for the exclusive use of Phase I unit owners. The Virginia Condominium Act, Code § 55.1-1919(C), provides:

> A common element not previously assigned as a limited common element shall be so assigned only pursuant to [Code § 55.1-1916(A)(6)]. The amendment to the declaration making such an assignment shall be prepared and executed by . . . the

---

[5] The Bylaws, Article 1, § 1.3 (Definitions), provide that terms defined in the Bylaws have that meaning throughout the Condominium Instruments.

- 14 -

> principal officer of the unit owners' association . . . . The
> amendment is effective when recorded.

Code § 55.1-1916(A)(6) provides:

> The declaration for every condominium shall contain . . . [a]
> description or delineation of all common elements . . . that may
> subsequently be assigned as limited common elements, together
> with a statement that (i) they may be so assigned and a description
> of the method by which any such assignments shall be made in
> accordance with the provisions of § 55.1-1919 . . . .

These code provisions require that the Condominium Association *amend* the declaration to specifically authorize the assignment of common elements as limited common elements. *See* Code §§ 55.1-1916, -1919. It is undisputed that the Board's 2015 parking re-allocation did not comply with any of these mandatory procedures for assigning the Phase I common element parking as limited common elements for the exclusive use of Phase I unit owners.

Acknowledging that the Condominium Association did not lawfully convert the Phase I common element parking to limited common elements, the Condominium Association contends that the Board's failure to follow the required procedures for creating limited common elements compels the conclusion that the Board's 2015 parking re-allocation instead *permissibly* designated the Phase I common element parking as reserved common elements. We agree with the trial court that the evidence does not support the Condominium Association's contention that the 2015 parking re-allocation designated the Phase I common element parking as reserved common elements. There is no evidence that the 2015 parking re-allocation granted a "revocable and/or conditional license" for the exclusive use of the Phase I common element parking. As found by the trial court, the 2015 parking re-allocation did not impose any *conditions* on the Phase I unit owners' exclusive use of the Phase I common element parking. Nor did the 2015 parking re-allocation express any limits on its duration or provide any revocation terms. On its face, the 2015 parking re-allocation was not intended to be revocable. As explained by the trial

- 15 -

court, the 2015 parking re-allocation was expressly intended to allocate the common element parking in Phase I in the same manner as the limited common element parking in other phases. This intention would be defeated if the 2015 parking re-allocation was revocable because the same discrepancy between Phase I common element parking and the limited common element parking in other phases would recur upon revocation. There is also no evidence that the Board exercised its power under Declaration Article 3, § 3.2, to impose a reasonable charge on Phase I unit owners for granting those owners exclusive use of reserved common element parking that had previously been available to all unit owners on a first-come, first-served basis. We thus agree with the trial court that the Board's 2015 parking re-allocation was an impermissible conversion of the Phase I common element parking to limited common elements.

Moreover, even if interpreting the 2015 parking re-allocation as designating all of the Phase I common element parking as reserved common elements for the exclusive use of Phase I unit owners, the 2015 parking re-allocation would violate the implied requirement that all unit owners be treated equally with respect to the common elements. *See Manchester Oaks Homeowners Ass'n, Inc. v. Batt*, 284 Va. 409, 420 (2012) (equality is inherent in the definition of a common area). In *Manchester Oaks*, the Virginia Supreme Court rejected a homeowners association's inequitable assignment of common area parking spaces. *See id.* The Court explained that a homeowners association "must assign parking spaces in the common area to all owners equally, if at all, unless the Declaration expressly provides otherwise." *Id.* The Court rejected the homeowners association's contention that a provision appearing to authorize an inequitable assignment of parking satisfied the requirement that inequitable assignments be expressly authorized because that provision could be implemented equitably. *See id.* Although *Manchester Oaks* involved a homeowners association governed by the Property Owners' Association Act, its rationale applies with greater force to a Condominium Association governed

by the Condominium Act because a condominium unit owner actually owns an undivided interest in the common elements. *See Gillman*, 223 Va. at 766 (recognizing that condominium unit owners are vested with an undivided interest in the common elements); Code § 55.1-1916(A)(7) (requiring that the condominium declaration shall contain "[t]he allocation to each unit of an undivided interest in the common elements"). Just as in *Manchester Oaks*, the Board's power to create reserved common elements could be implemented equitably. For example, the reserved common element power could be equitably exercised to ensure that all unit owners have the ability to occasionally reserve additional parking to support a temporary spike in their parking requirements. Thus, because there is no express provision in the Declaration expressly authorizing the *inequitable* assignment of common element parking spaces and there is no necessary conflict between the reserved common element assignment power and the implied requirement to assign access to common elements equitably, the 2015 parking re-allocation was impermissible. *See Manchester Oaks*, 284 Va. at 420.

> B. *The Condominium Association's 2015 parking re-allocation failed to comply with Fairfax County zoning ordinance minimum requirements for off-street parking to support the non-residential uses of 7205 Telegraph.*

The Condominium Association contends that the trial court erred in determining that the Board's 2015 parking re-allocation breached the Condominium Instruments by failing to comply with the Fairfax County zoning ordinance, specifically Article 11, §§ 11-104(14) (parking spaces required for office space use) and 11-105(5) (parking spaces required for warehouse use).[6] The Bylaws, Article 5, § 5.8(a)(3), require that "all . . . zoning ordinances . . . shall be observed." According to the 2020 non-residential use permits for 7205 Telegraph's Phase IV units, these units have approximately 3,750 square feet dedicated to office space use, and approximately

---

[6] Fairfax County changed the off-street parking zoning ordinance from Article 11 to Article 6 on July 1, 2021, but made no substantive changes.

12,124 square feet dedicated to storage yard use. The zoning ordinance requires a minimum of one off-street parking space per 1,000 square feet of storage yard or warehouse use. *See* Zoning Ordinance, Art. 11, § 11-105(5). The zoning ordinance requires a minimum of 3.6 off-street parking spaces per 1,000 square feet of office space. *See* Zoning Ordinance, Art. 11, § 11-104(14). Thus, at least 13 parking spaces are required to support 7205 Telegraph's storage yard use, and at least 14 spaces are required to support 7205 Telegraph's office space use, or a total of about 27 spaces, as the trial court so found.[7]

The Condominium Association does not dispute that the Fairfax County zoning ordinance requires compliance with a formula that determines the amount of off-street parking required to support non-residential uses. Nor does the Condominium Association dispute that the 2015 parking re-allocation limited 7205 Telegraph to 12 marked parking spaces. The Condominium Association instead contends that the 2015 parking re-allocation did not violate the Fairfax County zoning ordinance because the ordinance only applies to the *total* amount of available off-street parking for the *entire* Condominium and the 2015 parking re-allocation made no change in that total.

The trial court's ultimate determination that the 2015 parking re-allocation violated the Fairfax County zoning ordinance by reducing 7205 Telegraph's available off-street parking is a legal determination reviewed de novo. *See Rowland v. Town Council of Warrenton*, 298 Va. 703, 710 (2020) (citing *Renkey v. County Bd. of Arlington Cnty.*, 272 Va. 369, 373 (2006)). This Court defers to the trial court's factual findings. *Grayson*, 300 Va. at 58. "When reviewing

---

[7] The trial court found that compliance with the zoning ordinance required that 7205 Telegraph have a minimum of 27 off-street parking spaces. No error was assigned to this factual finding. For the purpose of this issue on appeal, the only pertinent fact is that limiting 7205 Telegraph to 12 spaces failed to comply with the zoning ordinance.

purely factual determinations, we ask whether they are 'plainly wrong or without evidence to support [them].'" *Id.* (alteration in original) (quoting Code § 8.01-680).

The Condominium Association contends that the zoning ordinance is ambiguous because Article 11, §§ 11-104 and 11-105, define the required amount of off-street parking by reference to the "gross floor area." According to the Condominium Association, because the plain meaning of "gross" is either whole or entire, the "gross floor area" may reasonably be construed to refer to the gross floor area of the entire Condominium, not individually to the gross floor area of each individual unit or structure. If the Condominium Association is correct, as long as the entire Condominium has enough parking to support all of the Condominium's uses for the gross floor area of the entire Condominium, there can be no violation of the zoning ordinance based on inadequate parking available to 7205 Telegraph. Pointing to the criminal penalties for zoning violations stated in the zoning ordinance at Article 8, § 8106 (3)(D), the Condominium Association asserts that any ambiguity in the meaning of "gross floor area" must be resolved in its favor.

As pointed out by 7205 Telegraph, the Condominium Association failed to make this statutory construction argument before the trial court. After reviewing those parts of the record cited by the Condominium Association in support of its representation that this assignment of error was preserved in the trial court, this Court finds no contention regarding any alleged ambiguity in the phrase "gross floor area." Nor is there any mention of an alleged ambiguity in the zoning ordinance that the trial court would need to resolve. In its trial brief, the Condominium Association argued:

> Fairfax County does not apply the zoning ordinance on a
> phase-by-phase basis but rather looks at the Condominium
> property as a whole, and the Condominium has far more on-site
> parking spaces than the zoning ordinance requires.

- 19 -

In its post-trial brief, the Condominium Association repeated its claim that no violation of the zoning ordinance results from the units in Phase IV having insufficient off-street parking to support their gross floor area and commercial uses as long as the entire Condominium has enough parking. In the absence of any reference to a particular statutory ambiguity that the trial court needed to resolve, the trial court could not have been on notice that the Condominium Association was arguing anything beyond a claim about the application of the zoning ordinance. The Condominium Association's statutory construction argument relating to a possible ambiguity in the meaning of "gross floor area" appears to have made its first appearance in this appeal.

Assuming arguendo that a general argument about how the zoning ordinance has been applied is sufficient to preserve a particular statutory construction argument based on the meaning of "gross floor area," the Condominium Association's argument fails because the asserted alternative meaning of "gross floor area" results in an unreasonable interpretation of the zoning ordinance. *See Turner v. Commonwealth*, 295 Va. 104, 109 (2018) (strict construction of penal statutes is limited to resolving *reasonable* ambiguities). The requirement to strictly construe penal statutes does not prevent courts from considering a statute's general purpose and design when construing it. *See id.* We do not adopt an unreasonably restrictive interpretation of a statute that would subvert the expressed legislative intent. *See id.*

The zoning ordinance recites that "[t]he provisions in this Ordinance apply to all land and structures." *See* Zoning Ordinance, Art. 1, § 1102 (Applicability). With respect to the particular off-street parking ordinance at issue here, the zoning ordinance provides that "all structures built, and all uses established must provide accessory off-street parking in accordance with this Article." *See* Zoning Ordinance, Art. 6, § 6100(1)(A)(1). This general statement of the zoning ordinance's applicability conflicts with the Condominium Association's claim that the zoning

- 20 -

ordinance should be interpreted to only apply to the Condominium as a whole. Plainly, the zoning ordinance applies to all structures, including the individual structures within a condominium. Also, the Condominium Association Bylaws, Article 5, § 5.8(a)(3), specifically provides that "all law, orders, rules, regulations or requirements . . . relating to *any portion* of the Property shall be complied with by . . . the Board of Directors." Thus, the Bylaws reject the Condominium Association's apparent view that the zoning ordinance cannot be applied to individual structures within the Condominium.

Unlike the Condominium Association's proposed construction, interpreting the zoning ordinance to apply to individual structures within the Condominium does not conflict with the application of the zoning ordinance to *all* land and structures. The Condominium Association's reliance on the rule of lenity to support adopting its narrow construction of "gross floor area" fails because interpreting that term to apply to individual structures accords with the language of the zoning ordinance without impairing its purpose. *See Cartwright v. Commonwealth*, 223 Va. 368, 372 (1982). As explained in *Cartwright*:

> [The rule of lenity] does not abrogate the well recognized canon that a statute . . . should be read and applied so as to accord with the purpose intended and attain the objects desired if that may be accomplished without doing harm to its language. Any construction that has the effect of impairing the purpose of the enactment or which frustrates, thwarts or defeats its objects should be avoided.

*Id.* (quoting *Gough v. Shaner, Adm'r.*, 197 Va. 572, 575 (1955)). Moreover, before the trial court, the Condominium Association appeared to recognize that the zoning ordinance applies to individual structures within the Condominium. To justify its purported exercise of the power to create reserved common elements, the Condominium Association asserted in the trial court:

> In a commercial project such as Telegraph Square II, the Board may need the flexibility to assign Reserved Common Elements to *individual units* to meet the parking requirements imposed by the

Zoning Ordinance as uses and the number of employees *in any particular unit* change over time.

If the Condominium Association's "gross floor area" construction is correct, no amount of reserving common element parking for individual units would have any effect whatsoever on the parking requirements imposed by the zoning ordinance.

The Condominium Association's additional argument that the trial court improperly deferred to an expert's conclusion that the 2015 parking re-allocation violated the applicable zoning ordinance is without merit. Nothing in the trial court's explanation of its ruling supports an inference that the trial court failed to construe and apply the zoning ordinance independently. At most, the trial court referenced the testimony of the experts for both the Condominium Association and 7205 Telegraph for additional support for the *trial court's* determination that compliance with the zoning ordinances required a minimum number of 27 off-street parking spaces to support its storage yard/warehouse and office space uses. In addition, the Condominium Association did not object when 7205 Telegraph's expert testified that under the applicable zoning ordinance, Phase IV of the Condominium was required to have at least 30 parking spaces. Because the Condominium Association did not object that this testimony improperly invaded the province of the trial court, the trial court was provided no opportunity to correct any misapprehension that its ruling depended on any improper deference to an expert. Moreover, the Condominium Association's expert opined that the 12 parking spaces available to 7205 Telegraph after the 2015 parking re-allocation were insufficient to comply with the zoning ordinance. This Court finds no error in the trial court's interpretation of the zoning ordinance as requiring that each unit have adequate supporting off-street parking, nor in the trial court's conclusion that 7205 Telegraph lacked sufficient off-street parking after the 2015 parking re-allocation.

*C. 7205 Telegraph's lost rent damages were foreseeable and proximately caused by the Condominium Association's 2015 parking re-allocation.*

The trial court found that 7205 Telegraph's loss of rent from its tenant D&K was foreseeable and proximately caused by the Condominium Association's 2015 parking re-allocation. The Condominium Association contends that even if the Board's 2015 parking re-allocation breached the Condominium Association's duties imposed by the Virginia Condominium Act and the Condominium Instruments, 7205 Telegraph's lost rent damages were neither foreseeable nor proximately caused by the Condominium Association. The Condominium Association does not dispute that a failure to comply with the Condominium Act or the Condominium Instruments is a breach of its contractual duties. *See Gillman*, 223 Va. at 766 (power exercised by a condominium association is contractual in nature).

The trial court's finding that the 2015 parking re-allocation proximately caused 7205 Telegraph's lost rent damages is a factual finding that will not be overturned unless it is unsupported by the evidence or is clearly erroneous. *See Virginia & Maryland R. Co. v. White*, 228 Va. 140, 144 (1984) (proximate cause is ordinarily a factual issue for resolution by the fact-finder). "The issue becomes one of law, to be decided by a court, only when reasonable minds could not differ concerning the conclusion to be drawn from the evidence." *Id.* at 144-45 (citing *Meeks v. Hodges*, 226 Va. 106, 109 (1983)). "The proximate cause of an event is that act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces that event, and without which that event would not have occurred." *Wells v. Whitaker*, 207 Va. 616, 622 (1966).

"Damages for breach of contract . . . are subject to the overriding principle of compensation. They are within the contemplation and control of the parties in framing their agreement. They are limited to those losses which are reasonably foreseeable when the contract is made." *Kamlar Corp. v. Haley*, 224 Va. 699, 706 (1983). "Loss may be foreseeable as a

- 23 -

probable result of a breach because it follows from the breach . . . in the ordinary course of events. . . ." *Restatement 2d of Contracts* § 351(2)(a). "Direct damages are those which arise 'naturally' or 'ordinarily' from a breach of contract; they are damages which, in the ordinary course of human experience, can be expected to result from a breach." *Roanoke Hosp. Ass'n v. Doyle & Russell, Inc.*, 215 Va. 796, 801 (1975). Whether damages caused by a breach of contract were *reasonably foreseeable* when the contract was made is a question of fact. *See Kamlar Corp.*, 224 Va. at 706. The plaintiff bears the burden to establish the element of damages with reasonable certainty. *See Sunrise Continuing Care, LLC v. Wright*, 277 Va. 148, 154 (2009) (citing *Nichols Construction Corp. v. Virginia Machine Tool Co., LLC*, 276 Va. 81, 89 (2008)). Contingent, speculative, and uncertain damages are not recoverable because they cannot be established with reasonable certainty. *See id.* (citing *Shepherd v. Davis*, 265 Va. 108, 125 (2003)); *Restatement 2d of Contracts* § 352 ("Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty.").

At trial, Akers, the managing member of 7205 Telegraph, testified that the 2015 parking re-allocation reduced 7205 Telegraph's available parking spaces to 12 and made it impossible for 7205 Telegraph to satisfy its contractual obligation under the D&K lease to provide its tenant

with exclusive rights to 20 parking spaces.[8]  Akers testified that immediately after the Board

adopted the 2015 parking re-allocation, D&K's principal, McDaniel, complained to him about

the insufficient number of available parking spaces.  McDaniel testified that when D&K no

longer had access to 20 parking spaces, he began to lose business and suffer financially.  To

address these concerns, Akers and McDaniel agreed to substitute the 2017 lease for the 2014

lease to provide additional interior square footage for vehicles within the units.[9]  After McDaniel

---

[8] The dissent argues that the void 2015 parking re-allocation is a *condominium instrument* that supersedes the express promise of 20 parking spaces stated in the 2014 lease and the 2017 lease.  Thus, the dissent concludes that 7205 Telegraph had no obligation to terminate its lease with D&K to avoid litigation over its failure to provide the expressly promised exclusive use of 20 parking spaces.  This argument was not asserted by the Condominium Association either before the trial court or on appeal.  Moreover, because the 2015 parking re-allocation is *void and of no effect*, it did not have the effect of superseding or qualifying the parking space provision of either the 2014 lease or the 2017 lease.  *See York Cnty. v. King's Villa, Inc.*, 226 Va. 447, 449 (1983) (ultra vires contract provision is void and of no effect).  Assuming arguendo that the Board's void 2015 parking re-allocation would have *excused* 7205 Telegraph's obligation to provide exclusive use of the promised parking spaces, it was foreseeable to the Condominium Association that 7205 Telegraph would have to release D&K from the lease because of the resulting failure of the material 20-parking-space lease provision.  *See Young-Allen v. Bank of Am., N.A.*, 298 Va. 462, 469 (2020) (remedy of equitable rescission is available when the underlying breach of contract is substantial or material); *Restatement 2d of Contracts* § 351 cmt. c (cost of settlement or litigation caused by a breach is foreseeable).

[9] The dissent contends that *after* the Board's void 2015 parking re-allocation, 7205 Telegraph's decision not to reduce the 20 parking spaces promised to D&K in the substitute 2017 lease is an intervening cause of 7205 Telegraph's loss of rental revenue.  However, without the substitute 2017 lease, the parking space covenant included in the five-year 2014 lease would have remained in effect through August 2019.  It was reasonably foreseeable to the Condominium Association that its void 2015 parking re-allocation would cause 7205 Telegraph to work with D&K to mitigate the resulting parking problems by providing additional square footage in a substitute lease.  It was also reasonably foreseeable that 7205 Telegraph would release D&K from the 2017 lease when that effort to mitigate the harm caused by the Board's unlawful reduction in 7205 Telegraph's exclusive parking spaces failed.  *See Restatement 2d of Contracts* § 351 cmt. c (cost of settlement or litigation caused by a breach is foreseeable).  Moreover, viewed in the light most favorable to 7205 Telegraph, the record shows that D&K's units could not be successfully re-leased subject to the parking constraints imposed by the void 2015 parking re-allocation.  Thus, the record, viewed in the light most favorable to 7205 Telegraph, does not support the dissent's conclusion that the 2017 lease was an intervening cause of 7205 Telegraph's lost rental revenue.

informed Akers that the lack of available parking had caused him to lose so much business that he could not pay D&K's rent, Akers agreed to let D&K out of the remainder of the lease.

Akers further testified that he was unable to obtain another tenant for the units vacated by D&K. Akers's listing agent testified that his inability to lease 7205 Telegraph's Phase IV units was attributable to the lack of certainty regarding the availability of parking.

The Condominium Association contends that the 2015 parking re-allocation did not proximately cause 7205 Telegraph to lose D&K as a tenant because (1) McDaniel did not directly testify that the 2015 parking re-allocation caused his parking issues; (2) McDaniel testified that unnamed others were occupying parking spaces that he had used for his business; (3) McDaniel testified that someone from the County informed him that he was not parking vehicles properly; (4) Akers voluntarily let D&K out of their lease; and (5) D&K renewed their lease in 2016, after the 2015 parking re-allocation.[10] These contentions fail to demonstrate that the trial court's contrary factual findings were without evidence to support them or clearly erroneous.

The trial court was entitled to credit Akers's testimony that the D&K lease was terminated and replaced with an updated lease after the 2015 parking re-allocation so that D&K would have additional space within the units to park vehicles. Akers testified that immediately after the 2015 parking re-allocation, McDaniel complained to Akers about the lack of available parking. Akers explained that before the expiration of the 2014 lease, D&K entered into the 2017 lease to obtain additional space for parking within the leased units.

The trial court was also entitled to credit Akers's factual claim that he allowed D&K out of the 2017 lease to avoid the risk of litigation resulting from his inability to fulfill his contractual promise to provide 20 parking spaces to D&K. Although McDaniel did not directly

_____

[10] The substitute 2017 lease was executed in December 2016.

- 26 -

attribute his parking problems to the Board's 2015 parking re-allocation, the trial court was entitled to view McDaniel's testimony together with the testimony of Akers. Together, viewed in the light most favorable to 7205 Telegraph, that testimony establishes that D&K's parking problems occurred immediately after the 2015 parking re-allocation. The trial court could also reasonably infer that 7205 Telegraph's inability to ensure that McDaniel had the use of the 20 spaces promised under the lease was proximately caused by the 2015 parking re-allocation because that measure prevented 7205 Telegraph from enforcing its right to access more parking spaces than the 12 Phase IV spaces appurtenant to its three units. The trial court's factual finding that the 2015 parking re-allocation proximately caused 7205 Telegraph's lost-rent damages was supported by the record and was not clearly erroneous.

7205 Telegraph's damages from lost rent were foreseeable to the Condominium Association because the Condominium Association specifically contemplated that unit owners would use their property to derive income from leasing their units to others. The Bylaws, Article 5, § 5.8(a)(6), specifically regulate the leasing of units by imposing restrictions on lease terms, reserving the option of requiring the use of a standard form lease, and retaining the authority to evict a unit owner's tenants. Because the Bylaws contemplate that unit owners will lease their units, it is reasonably *foreseeable* that the Condominium Association's breach of the Condominium Instruments would cause a loss of lease-derived income.

> D. *7205 Telegraph's lost rental income is a proper measure of the damages proximately caused by the Condominium Association's 2015 parking re-allocation.*

The Condominium Association contends that the trial court, upon finding it breached the Condominium Instruments, erred in awarding 7205 Telegraph lost rent resulting from the termination of the D&K lease. The Condominium Association claims that the proper measure of damages is the alleged diminution of the value of 7205 Telegraph resulting from the reduction in available parking spaces—not lost rent. We disagree with the Condominium Association.

- 27 -

In a claim for breach of contract, proof of damages is an essential element and a plaintiff's failure to prove it requires that the action be dismissed. *See Collelo v. Geographic Servs., Inc.*, 283 Va. 56, 72 (2012); *Sunrise Continuing Care, LLC*, 277 Va. at 156. Further, the plaintiff bears "the burden of proving with reasonable certainty the amount of damages and the cause from which they resulted; speculation and conjecture cannot form the basis of the recovery. Damages based on uncertainties, contingencies, or speculation cannot be recovered." *Shepherd*, 265 Va. at 125 (citations and internal quotation marks omitted). This burden requires the plaintiff "to furnish evidence of sufficient facts and circumstances to permit the fact-finder to make at least an intelligent and probable estimate of the damages sustained." *Dillingham v. Hall*, 235 Va. 1, 4 (1988) (internal quotation marks omitted). "Proof with mathematical precision is not required, but there must be at least sufficient evidence to permit an intelligent and probable estimate of the amount of damage." *Id.* at 3-4 (emphasis and internal quotation marks omitted).

The Condominium Association's contention that the correct measure of damages is the diminution of property value from the loss of parking spaces fails because that measure only applies when the property is permanently damaged. Every case cited by the Condominium Association supporting its alternative measure of damages based on the diminution of property value involves permanent property loss. *See Norfolk & W.R. Co. v. Richmond Cedar Works*, 160 Va. 790, 807 (1933) (permanent injury to property); *Richmeade, L.P. v. City of Richmond*, 267 Va. 598, 603 (2004) (permanent loss of a property right); *Town of Galax v. Waugh*, 143 Va. 213, 228 (1925) (permanent alteration of property). Under Virginia law, lost rent damages are available provided that the loss of rental income is proven with reasonable certainty to have been proximately caused by the defendant. *See Sachs v. Hoffman*, 224 Va. 545, 549 (1983) (awarding lost rent damages where the lost rents were proximately caused by damage to property caused by the defendant). Because the Board's 2015 parking re-allocation is void, any damage to

7205 Telegraph caused thereby is temporary. Consequently, the trial court did not err in declining to base its damages award on the diminution of property value from the 7205 Telegraph's temporary loss of parking spaces.

The damage to 7205 Telegraph caused by the Board's 2015 parking re-allocation is temporary because that Board measure is void. Loss of rent was a foreseeable consequence of the Condominium Association's breach because the Condominium Association contemplates that unit owners are deriving rental income from leasing their units. Therefore, the trial court properly awarded damages based on the rent lost by 7205 Telegraph as a result of the loss of the D&K lease proximately caused by the Condominium Association's breach. The trial court, having found that the Board's illegal 2015 parking re-allocation proximately caused 7205 Telegraph to lose D&K as a tenant, reasonably limited the lost rent damages based on the rent that would have been due to 7205 Telegraph under the lease had the lease not been canceled. As explained by the trial court, this measure of lost-rent damages objectively reflected the rent that someone at arm's-length would pay. Thus, the evidence supports the trial court's lost-rent damages award and that award is not clearly erroneous.

> E. *The Condominium Association did not present a mitigation defense that the trial court failed to consider.*

The Condominium Association claims that the trial court erred in failing to *consider* its mitigation defense but provides no record support for its claim that a mitigation defense was ever *presented* to the trial court. "An assertion that an injured party has failed to mitigate damages is an affirmative defense." *Forbes v. Rapp*, 269 Va. 374, 380 (2005). The Condominium Association bore the burden of proof on this issue. *See id.* Whether the Condominium Association "has satisfied its burden of showing that the [injured party] failed to mitigate its damages is a factual determination based on the evidence produced." *See RK Chevrolet, Inc. v. Bank of Commonwealth*, 256 Va. 74, 77 (1998).

As explained above, the record supports the trial court's factual determination that the Board's 2015 parking re-allocation was the proximate cause of 7205 Telegraph's loss-of-rent damages. The record also supports a finding that the Board's 2015 parking re-allocation continued to impede 7205 Telegraph's efforts to lease or sell its units after the lease with D&K was terminated. 7205 Telegraph's realtor testified that interested potential tenants or buyers declined to move forward because of the inability of 7205 Telegraph to ensure the availability of adequate parking.

The Condominium Association's contention that 7205 Telegraph failed to mitigate its damages by specifically failing to request more parking spaces after the Board's 2015 parking re-allocation is expressly contradicted by the record. As found by the trial court:

> In the years following the Board's [2015 parking re-allocation],
> 7205 Telegraph [] sent multiple letters to the board outlining how
> it believed the new parking regime was illegitimate and that it had
> suffered monetary damages as a result.

The record amply supports this finding. Specifically, Akers wrote to the Board on March 20, 2017, explaining that the 2015 parking re-allocation was causing "severe financial strain to [him] and his tenants." On March 30, 2017, Akers's attorney wrote to the Board explicitly requesting that 22 parking spaces in the Phase I common element parking area be marked and designated for 7205 Telegraph. In June 2018, Akers wrote the Board to repeat his request that his share of parking spaces in the Phase I common element parking area be reserved for 7205 Telegraph. The record does not disclose that the Board took any steps to provide additional parking spaces to 7205 Telegraph in response to these letters. Thus, the record is devoid of support for the Condominium Association's claim that 7205 Telegraph could have mitigated its damages by merely asking for more spaces.

The Condominium Association's further contention that the trial court precluded it from offering draft amendments to the Condominium Instruments *as part of a mitigation defense* is

also unsupported by the record.  Before the trial court, the Condominium Association *expressly limited* the proposed introduction of the draft amendments to the issues of attorney fees and potential means the Condominium Association may use to comply with any injunction imposed by the trial court.  Upon determining that the draft amendments appeared to be part of the Condominium Association's effort to compromise a claim in the litigation, the trial court excluded the amendments as inadmissible pursuant to Virginia Rule of Evidence 2:408.  In the face of this clear ruling from the trial court, the Condominium Association was obligated, but failed, to respond to this ruling by alerting the trial court to any alternative ground of admissibility based on a mitigation defense.  *See Neal v. Commonwealth*, 15 Va. App. 416, 422 (1992).  As explained by *Neal*, "[w]hen evidence apparently inadmissible is offered for a limited purpose, the party making the offer has the burden of making clear to the court [the party's] theory of admissibility."  *Id.*  "Failure to do so in the trial court cannot be remedied by offering the theory of admissibility for the first time on appeal."  *Id.*  Moreover, "[it] is well settled that when a party's evidence has been ruled inadmissible, the party must proffer or avouch the evidence for the record in order to preserve the ruling for appeal; otherwise, the appellate court has no basis to decide whether the evidence was admissible."  *Zelanak v. Commonwealth*, 23 Va. App. 259, 267 (1996), *aff'd en banc*, 25 Va. App. 295 (1997).  The Condominium Association's failure to alert the trial court to its alternative ground for admissibility of the draft amendments, coupled with the Condominium Association's failure to proffer the amendments for appellate review of the trial court's ruling, precludes this Court from reviewing the trial court's exclusion of the draft amendments.

*F. The Condominium Association improperly assessed 7205 Telegraph for the repair and maintenance of Phase I common elements allocated for the exclusive use and benefit of Phase I unit owners.*

The trial court correctly held that the Condominium Association improperly assessed 7205 Telegraph for the repair and maintenance of Phase I common elements that the 2015 parking re-allocation allocated for the exclusive use and benefit of Phase I unit owners. The Bylaws, Article 5, § 5.1(c)(2), provide that "any common expenses paid or incurred for the benefit of less than all the condominium units shall . . . be specially assessed against the condominium unit or units involved to the extent each is thereby benefitted." Because only the Phase I unit owners benefitted from the Phase I common element parking after the 2015 parking re-allocation, the trial court correctly held that only Phase I unit owners could be properly assessed for the repair, replacement, and maintenance of those common elements. Also, the Bylaws, Article 5, § 5.2, provide that "[n]o unit owner may be exempted from liability for the assessment of common expenses by waiver of the use or enjoyment of any of the common elements or by abandonment or such unit owner's unit." By specifically enumerating circumstances under which a unit owner may not be exempted from liability for common expenses, the Bylaws impliedly authorize a unit owner to assert an exemption to common expenses on other grounds.

Moreover, as explained above, the trial court found that, in passing the 2015 parking re-allocation measure, the Board intended to convert the Phase I common element parking into limited common element parking reserved for the exclusive use of Phase I unit owners. Although the intended conversion of the Phase I common element parking to limited common elements is void because the Board failed to follow statutorily required procedures for converting common elements into limited common elements, the Board further breached the Condominium Bylaws when it failed to adjust its assessments for the replacement, repair, and maintenance of

the illegally converted common elements. The Bylaws, Article 1, § 1.3(d), define *limited common expenses* to mean expenses separately assessed against less than all the unit owners pursuant to Bylaws, Article 5, § 5.1(c)(2), and the Condominium Act. The Condominium Act provides that any common expenses relating to limited common elements and benefitting less than all unit owners shall be specially assessed against the unit owners benefitted. *See* Code § 55.1-1964(A). Thus, having unlawfully converted the Phase I common element parking to limited common elements for the exclusive benefit of Phase I unit owners, the Board was obligated, but failed, to exclusively assess Phase I unit owners for their replacement, repair, and maintenance.

G. *7205 Telegraph is entitled to an award of its attorney fees as a prevailing party pursuant to the Virginia Condominium Act.*

As the prevailing party, 7205 Telegraph is entitled to its reasonable attorney fees pursuant to Code § 55.1-1915(A). Moreover, there is no support in the Condominium Act, the Declaration, or the Bylaws for the Condominium Association's contention that it is entitled to recover from 7205 Telegraph its share of the Condominium Association's legal expenses as a common expense. Although the Condominium Association has the power to recover authorized expenses from the unit owners, and the expense of its legal defense is an authorized expense, the Bylaws, Article 5, § 5.1(C)(2), specifically provide that any common expenses that benefit less than all of the unit owners are to be assessed against the unit owners benefitting from the expense. Thus, any apparent conflict between the Virginia Condominium Act and the Condominium Instruments is avoided by reasonably categorizing the Condominium Association's legal expenses in this litigation as expenses exclusively benefiting unit owners other than 7205 Telegraph. Accordingly, the trial court correctly ordered that the Condominium Association is prohibited from utilizing its assessment power to recover the expense of its unsuccessful legal defense from 7205 Telegraph.

- 33 -

CONCLUSION

The trial court did not err in holding that the Condominium Association's 2015 parking re-allocation violated both the Condominium Act and the Condominium Instruments by improperly converting the Phase I common element parking into limited common elements for the exclusive use of Phase I unit owners. The trial court also did not err in holding that the Condominium Association violated the Condominium Instruments by failing to comply with all zoning ordinances *with respect to any portion of the Condominium* when it limited 7205 Telegraph's parking to the 12 Phase IV parking spaces, resulting in 7205 Telegraph having access to fewer parking spaces than required by the Fairfax County zoning ordinance. Additionally, the trial court did not err in finding that the 2015 parking re-allocation breached the Condominium Association's obligations under the Condominium Instruments and proximately caused 7205 Telegraph to lose a commercial tenant and suffer lost-rent contract damages. Therefore, this Court finds no error in the trial court's award of damages and attorney fees to 7205 Telegraph.

*Affirmed*.

Ortiz, J., concurring in part, and dissenting in part.

Although I agree with the majority that the Condominium Association breached its contract with 7205 Telegraph, I find the evidence insufficient to prove that the new parking regime proximately caused 7205 Telegraph to lose its tenant and to establish the damages. The majority is correct that we should "give deference to the trial court's findings of fact and view those findings in the light most favorable to . . . the prevailing party below," *Zelnick v. Adams*, 269 Va. 117, 123 (2005), and "ask whether they are plainly wrong or without evidence to support [them]," *Grayson v. Westwood Buildings L.P.*, 300 Va. 25, 58 (2021) (alteration in original). Operating under these guiding principles, I find that the trial court's conclusions regarding proximate causation are premised on mere speculation, and are without evidence. Therefore, I would reverse on the second and third assignments of error and vacate the damage award of $481,434.84 for the Condominium Association's breach of contract.

I. No evidence shows that the new parking regime proximately caused the termination of the lease.

"The proximate cause of an event is that act or omission which, in natural and continuous sequence, *unbroken by an efficient intervening cause*, produces the event, and without which that event would not have occurred." *Beale v. Jones*, 210 Va. 519, 522 (1970) (emphasis added). Even assuming that the evidence was sufficient for the trial court to conclude that the new parking regime caused D&K to suffer financially, uncontested evidence established at least two intervening causes that led to 7205 Telegraph's loss of rent.

First, 7205 Telegraph voluntarily terminated its lease with D&K. McDaniel testified that when he "asked out of the lease" because he was losing business, Akers "helped" him by "let[ting him] out of the lease." Although Akers testified that he terminated the lease "because [he] wasn't providing the 20 spaces that [he] was required to provide [D&K]" and that "[l]uckily, [D&K] just let [him] terminate the lease versus trying to bring suit against [him]," he did not

- 35 -

testify that D&K actually breached by failing to pay rent. Neither did he testify that his decision was based on his fear of being sued, or that D&K had threatened to sue him. In fact, any such fear would have been speculative at best, because the lease promised 20 parking spaces "subject to the terms and provisions of the condominium documents effecting and/or governing the Parking Area."[11] When the new parking regime left 7205 Telegraph with only 12 parking spaces, it had no contractual duty to provide more to D&K. Thus, it is unclear that D&K would have had a breach of contract claim against 7205 Telegraph at all. Therefore, 7205 Telegraph's voluntary decision to terminate the lease was the main intervening cause leading to its damages.

Second, even assuming 7205 Telegraph breached the lease by not providing 20 parking spaces, it had voluntarily signed the lease in 2016 knowing that it would breach it. Akers testified that "in October 2015, when the board passed their motion, they said [Akers] could no longer park in the red area, but that "everybody just kind of ignored the motion because everybody needed to run their businesses and park somewhere." The testimony shows that Akers was aware that he no longer had sufficient parking spaces when he signed the new lease with D&K in 2016, promising 20 parking spaces. Fully aware of the new parking regime and despite losing parking spots in 2015 parking re-allocation, 7205 Telegraph entered a new lease with D&K in 2016, promising something it could not deliver on.[12] 7205 Telegraph's decision to

---

[11] As the majority points out, the leases "qualified this requirement with 7205 Telegraph's covenant 'not to amend the existing condominium documents'" materially. Consistent with this provision, 7205 Telegraph did not vote to amend the parking regime. Moreover, while the trial court based its award of lost rent damages on the termination of the 2017 lease, the 2017 lease was signed after the Condominium Association amended the parking regime.

[12] The majority finds that 7205 Telegraph and D&K replaced the 2014 lease with the 2017 lease *because* the 2015 parking re-allocation made it impossible for 7205 Telegraph to provide the contractually required 20 parking spaces. If the 2017 lease indeed provided extra interior square footage to compensate for D&K's loss of exterior parking spaces due to the re-allocation, then it further shows that D&K was aware that it would no longer have access to all 20 exterior parking spaces when it signed the lease in 2016.

knowingly promise what it could not provide was thus another intervening cause of its damages. Given the two intervening causes, supported by uncontested evidence, the new parking regime was not the proximate cause of 7205 Telegraph's lost rent.

## II. The lost rent was unforeseeable and speculative consequential damages.

"Direct damages are those which flow naturally or ordinarily from the contract breach," while "[c]onsequential damages occur from the intervention of special circumstances that are not ordinarily predictable." *Long v. Abbruzzetti*, 254 Va. 122, 126 (1997). Consequential damages "are compensable only if the special circumstances were within the contemplation of all contracting parties at the time the contract was made." *Id.* at 127. "Damages cannot be recovered if derived from uncertainties, contingencies, or speculation." *SunTrust Bank v. Farrar*, 277 Va. 546, 554 (2009).

Here, 7205 Telegraph's damages were consequential because they resulted from an intervening fact that 7205 Telegraph terminated its lease with D&K. Furthermore, while the Condominium Association could have reasonably foreseen that unit owners would lease their properties to tenants, it could not have reasonably foreseen that, *after* it adopted a new parking regime, a unit owner would *knowingly* sign a lease inconsistent with the regime. Neither could it have foreseen that 7205 Telegraph would voluntarily terminate the lease without either party breaching it.[13] Moreover, it is "purely speculative" whether 7205 Telegraph would have incurred the damages had it not terminated its lease. *Long*, 254 Va. 122. As discussed above,

---

[13] Citing caselaw on equitable rescission, the majority finds that "it was foreseeable to the Condominium Association that 7205 Telegraph would have to release D&K from the lease because of the resulting failure of the material 20-parking-space lease provision." This reasoning still presupposes that 7205 Telegraph breached the lease. *See Young-Allen v. Bank of Am., N.A.*, 298 Va. 462, 469 (2020) ("Rescission based upon a breach of contract is not a cause of action in itself, but rather a remedy."). As is argued above, 7205 Telegraph failed to prove that it had breached its lease with D&K. Therefore, the Condominium Association had no reason to expect that the lease would be equitably rescinded.

7205 Telegraph's fears of litigation or a lawsuit brought by D&K were unfounded and speculative at best. Instead, the voluntary nature of the lease termination caused any lost rent incurred. Therefore, 7205 Telegraph's lost rent damages were unforeseeable, speculative, and thus non-compensable.

For these reasons, I respectfully dissent from Part C of the majority opinion. I would vacate the trial court's award of damages in the amount of $481,434.84 for the Condominium Association's breach of contract and affirm the remainder of the trial court's final order.